[No. A070573. First Dist., Div. Two. Jan. 9, 1997.]

WILLIAM N. STIRLEN, Plaintiff and Respondent, v.
SUPERCUTS, INC., et al., Defendants and Appellants.

1524

## COUNSEL

Daniel J. Herling for Defendants and Appellants.

Kathleen M. Lucas and David S. Schwartz for Plaintiff and Respondent.

## OPINION

**KLINE, P. J.**—The San Francisco Superior Court refused to enforce a compulsory arbitration clause of an employment contract on the grounds it

was against public policy and unconscionable. We find this determination correct and hold that, in the circumstances of this case, the governing state law pertaining to unconscionable contracts (Civ. Code, § 1670.5) is not preempted by the Federal Arbitration Act. (9 U.S.C. §§ 1-14.)

## I.

Defendants Supercuts, Inc., and David E. Lipson, its president and chief executive officer (hereinafter collectively referred to as Supercuts), appeal from an order denying their motion to compel arbitration of a dispute relating to the termination from employment of plaintiff William N. Stirlen.

Supercuts, a Delaware corporation that conducts a national hair care franchise business, employed Stirlen as its vice-president and chief financial officer from January 1993 until March 1994, when he was terminated.

Stirlen commenced this wrongful discharge case in December 1994. His complaint alleged seven causes of action for (1) a judicial declaration that an arbitration clause in his employment contract was null and void in certain particulars and unenforceable; (2) wrongful termination in violation of public policy; (3) defamation; (4) intentional misrepresentation; (5) violation of Labor Code section 970, governing certain knowingly false representations inducing workers "to change from one place to another"; (6) breach of contract; and (7) breach of the implied covenant of good faith and fair dealing.

Supercuts demurred to all causes of action except the first, pertaining to the validity of the arbitration clause, and the fifth, alleging violation of Labor Code section 970. On May 10, 1995, the superior court sustained the demurrer without leave to amend with respect to the sixth and seventh causes of action for breach of contract and the implied covenant. The court overruled the demurrer with respect to the causes of action for wrongful termination, defamation, and intentional misrepresentation.

On April 21, 1995, while the demurrer was pending, Supercuts moved to compel arbitration under the compulsory arbitration provision of an employment contract between the parties. The court denied the motion, as we have said, on the grounds the provision, considered in its entirety, was unconscionable and therefore unenforceable.

After answering the complaint, Supercuts filed this timely appeal. An order dismissing or denying a motion to compel arbitration is directly appealable. (Code Civ. Proc., § 1294, subd. (a).)

## II.

The complaint alleges that on numerous occasions in late 1993 and early 1994 Stirlen informed Lipson and other corporate officers of various operating problems he felt contributed to the general decline in Supercuts' retail profits and of "accounting irregularities" he feared might be in violation of state and federal statutes and regulations. Stirlen also expressed concern that the decline in profits "was being hidden in the books and from public shareholders." At a meeting in November 1993, Stirlen provided senior managers quarterly statements indicating that, before accounting "adjustments," Supercuts' earnings level moved only laterally or actually declined during the previous seven quarters. Though Lipson assertedly expressed anger at the production of these statements, Stirlen reiterated his concerns in a memo to Lipson in January of 1994. After Stirlen brought these concerns to the company's auditor, Lipson allegedly reprimanded him, accused him of being a "troublemaker" and told him that if he did not reverse his position on the issues taken to the auditor he would no longer be considered a "member of the team."

At the end of February 1994, Lipson called Stirlen to his office and suspended him from his job. He was terminated the following month. The complaint avers the termination was unjustified, that Stirlen had never been informed he was not fulfilling his responsibilities as chief financial officer or otherwise doing a poor job, and had never been disciplined or advised that his employment was in jeopardy. Thereafter, Lipson assertedly represented to independent securities analysts that Stirlen was responsible for erroneous accounting entries or "adjustments" that resulted in a decline in earnings from 70 cents to 63 cents per share, and that, as a result "Bill Stirlen is no longer with the company." News articles and investment reports on Supercuts at about this time attributed the company's declining earnings to "improper bookkeeping procedures" and said the individuals "deemed responsible for the irregularities were asked to leave the Company." One news article quoted Lipson to the effect that Stirlen had lost his job as a result of "sloppy and inappropriate accounting."

On July 21, 1994, Supercuts' general counsel wrote Stirlen's counsel rejecting the latter's prelitigation settlement demand and stating that the dispute should be submitted to binding arbitration, as specified in the employment contract. Stirlen never responded to this and a subsequent request to arbitrate made prior to the filing of the motion to compel arbitration.

## III.

Code of Civil Procedure section 1281.2 provides in material part that "[o]n petition of a party to an arbitration agreement alleging the existence of

a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists . . . ." ■ In a petition to compel arbitration under this statute, "the moving party, in essence, requests specific performance of a contractual agreement to arbitrate the controversy. [Citation.] The trial court must determine in advance whether there is a duty to arbitrate the controversy. [Citation.] This determination 'necessarily requires the court to examine and, to a limited extent, construe the underlying agreement.' [Citation.]" (*Green* v. *Mt. Diablo Hospital Dist.* (1989) 207 Cal.App.3d 63, 69 [254 Cal.Rptr. 689].)

The determination of the validity of an arbitration clause, which may be made only "upon such grounds as exist for the revocation of any contract" (Code Civ. Proc., § 1281), "is solely a judicial function unless it turns upon the credibility of extrinsic evidence; accordingly, an appellate court is not bound by a trial court's construction of a contract based solely upon the terms of the instrument without the aid of evidence." (*Merrick* v. *Writers Guild of America, West, Inc.* (1982) 130 Cal.App.3d 212, 217 [181 Cal.Rptr. 530].)[1] Thus, in cases such as this, in which extrinsic evidence was not presented, "[d]eterminations of arbitrability, like the interpretation of any contractual provision, are subject to *de novo* review." (*Republic of Nicaragua* v. *Standard Fruit Co.* (9th Cir. 1991) 937 F.2d 469, 474.)[2]

## IV.

The employment contract between the parties, formally denominated "Agreement Regarding Trade Secrets, Inventions, Employment and Competition," consists of 23 paragraphs. Throughout, Stirlen is referred to as "Executive," "he/she" or "his/her," and Supercuts is referred to as "the Company." The first six paragraphs briefly describe Stirlen's duties, the fact that his employment is at will, his compensation and fringe benefits, and other compensation he may receive as well as the manner in which he will be reimbursed for certain expenses.

---

[1] "[W]here . . . the enforceability of an arbitration clause may depend upon which of two sharply conflicting factual accounts is to be believed, the better course would normally be for the trial court to hear oral testimony and allow the parties the opportunity for cross-examination." (*Rosenthal* v. *Great Western Financial Securities Corp.* (1996) 14 Cal.4th 394, 414 [58 Cal.Rptr.2d 875, 926 P.2d 1061].)

[2] When the validity of an arbitration clause turns on a factual determination "[t]he standard on appeal is whether there is substantial evidence to support the trial court's finding." (*Green* v. *Mt. Diablo Hospital Dist., supra*, 207 Cal.App.3d at p. 69.) On the propriety of judicial as opposed to jury determinations of unconscionability, see Price, *The Conscience of Judge and Jury: Statutory Unconscionability as a Mixed Question of Law and Fact* (1981) 54 Temp. L.Q. 743.)

Paragraph 7 provides that any inventions, improvements, ideas or discoveries relating to the company's business that the employee may conceive during the period of employment, whether patentable or not, must be disclosed and assigned to the company and "shall be the sole and exclusive property of the Company." Paragraph 8 states that certain confidential and proprietary information to which the employee may have access shall constitute trade secrets which the employee shall not disclose to third persons without company authorization. Under paragraph 9 the employee agrees to deliver to the company "at the termination of his/her employment, or at any other time that the Company may request," all information and equipment the employee may then have under his or her control, which is "the sole property of the Company." Under paragraph 10 the employee agrees that during the period of employment with the company and for two years thereafter he or she will not directly or indirectly engage in any similar business within the United States and specified Canadian territories, and will not attempt to induce other employees to leave the company, or franchisee to discontinue its relationship with the company, or customer or supplier to cease doing business with the company.

Paragraph 11 is entitled "Submission to Jurisdiction; Arbitration" and comprises what we refer to in this opinion as the "arbitration clause." This provision consists of four subparagraphs.

Subparagraph (a), which pertains to claims that need *not* be submitted to arbitration, provides as follows: "Any action initiated by the Company seeking specific performance or injunctive or other equitable relief in connection with any breach or violation of Paragraphs 7, 8, 9, or 10 of this Agreement may be maintained in any federal or state court having jurisdiction over Marin County, California. The parties hereby submit themselves to the jurisdiction of any such court for the purpose of resolving all such actions, waive any objections to the service of any such court, and agree not to challenge the exclusive jurisdiction of such court." The parties further agree that in the event Supercuts commences an action against the employee for violation of the provisions contained in paragraphs 7, 8, 9 or 10, "Executive's employment hereunder and the Company's payment of Salary, benefits, and/or any unpaid Severance Compensation (as provided in Paragraph 13 herein) shall cease, without penalty to the Company, pending the outcome of such action or, if the parties submit any such claim to arbitration hereunder, pending the outcome of such arbitration."

Subparagraph (b) of paragraph 11 states that, "[e]xcept as provided in Paragraph 11. a. hereinabove, in the event there is any dispute arising out of Executive's employment with the Company, the termination of that employment, or arising out of this Agreement, whether such dispute gives rise or

may give rise to a cause of action in contract or tort or based on any other theory or statute, including but not limited to the California Fair Employment & Housing Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, or any other act or statute, Executive and the Company agree that exclusive recourse shall be to submit any such dispute to final and binding arbitration pursuant to the provisions of the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*), if applicable, or the provisions of Title 9 of Part III of the California Code of Civil Procedure, commencing at § 1280, or any successor or replacement statutes, if the Federal Arbitration Act does not apply, upon a request submitted in writing in accordance with the notice provisions of this Agreement to the other party to this Agreement within one (1) year of the date the dispute arose, or, in the case of a dispute arising out of the termination of Executive's employment, within one (1) year of the date Executive's employment was terminated. The failure to timely request arbitration hereunder shall constitute a complete waiver of all rights to raise any claims in any forum, arising out of any dispute described herein. The one (1) year limitations period within which to request arbitration shall not be subject to tolling, equitable or otherwise."

Subparagraph (c) of paragraph 11 restricts the remedies available in arbitration. The parties agree that "in arbitration, the exclusive remedy for alleged violation of this Agreement or the terms conditions, or covenants of employment, and for any harm alleged in connection with any dispute subject to arbitration hereunder (including, without limitation, causes of action arising in tort), shall be a money award not to exceed the amount of actual damages for breach of contract, less any proper offset for mitigation of such damages, and the parties shall not be entitled to any other remedy at law or in equity, including but not limited to other money damages, exemplary damages, specific performance, and/or injunctive relief."

The final subparagraph of paragraph 11, subparagraph (d), prescribes the method for choosing an arbitrator and provides that the arbitrators decision "will be final and binding on the parties," the arbitrator's fees will be shared by the parties, the arbitration shall be held in Marin County, and "the arbitrator shall not have the power to alter, amend, or modify any of the provisions of this agreement."

The trial court's determination that the arbitration clause offended public policy related to the provision of subparagraph (c) of the arbitration clause that the "exclusive remedy" for any violation of any claim required to be submitted to arbitration "shall be a money award not to exceed the amount of actual damages for breach of contract," specifically excluding, among other

things, exemplary damages. The court found that this restriction violates Civil Code section 1668, which provides that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." We need not separately address the question whether the restriction on employee remedies is "against the policy of the law" within the meaning of this statute. As will be seen, the restriction bears as well on the question of unconscionability and can be most efficaciously addressed in that context.

## V.

██ The trial court succinctly explained its conclusion that the arbitration clause was "so one-sided as to be unconscionable" as follows: "Defendants can use the court system for certain claims, but the plaintiff must use arbitration for all his, with very limited damages. The plaintiff gives up significant rights, and defendant is protected from liability for all fraud, willful injury or violation of law."

██ The judicially developed criteria for determining whether an arbitration clause is unconscionable and therefore unenforceable are set forth in *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807 [171 Cal.Rptr. 604, 623 P.2d 165] (*Scissor-Tail*), which the trial court explicitly relied upon. The analysis commences with the determination whether the agreement to arbitrate is a contract of adhesion. If it is, the court must then determine whether other factors operate to render it unenforceable. "Generally speaking," the court declared, "there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him. [Citations.] The second—a principle of equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectation of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.' [Citations.]" (*Id.*, at p. 820.) In other words, an adhesive contract "would remain fully enforceable unless (1) all or part of the contract fell outside the reasonable expectations of the weaker party *or* (2) it was unduly oppressive or unconscionable under applicable principles of equity." (*Izzi* v. *Mesquite Country Club* (1986) 186 Cal.App.3d 1309, 1317 [231 Cal.Rptr. 315], italics added, citing *Keating* v. *Superior Court* (1982) 31 Cal.3d 584, 594 [183 Cal.Rptr. 360, 645 P.2d 1192].)

In 1979, after initiation of the trial proceedings in *Scissor-Tail*, the Legislature enacted Civil Code section 1670.5, and thereby adopted the doctrine

of unconscionability enunciated in section 2-302 of the Uniform Commercial Code, except that section 1670.5 applies to all contracts, not just those for the sale of goods.[3] (*A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473, 485 [186 Cal.Rptr. 114].) Section 1670.5, which is identical to section 2-302 of the U.C.C. and is set forth in its entirety in the margin below,[4] does not itself provide a definition of what is or is not "unconscionable," which suggests the concept cannot be satisfactorily defined in the abstract. The closest the comments to the Uniform Commercial Code come to a definition is the declaration that the "basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." (U. Com. Code, § 2-302, com. 1.)

The Uniform Commercial Code doctrine of unconscionability adopted in Civil Code section 1670.5 mandates an analysis that is not materially different from that described in *Scissor-Tail*. The two approaches were harmonized in *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913 [216 Cal.Rptr. 345, 702 P.2d 503], where the court observed that "[b]oth pathways should lead to the same result." (*Id.*, at p. 925, fn. 9.)[5] ▮ Under the Uniform Commercial Code provision, " '[u]nconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' [Citations.] Phrased another way, unconscionability has both a 'procedural' and a 'substantive' element. [Citations.]

[3]Codification of the doctrine of unconscionability, which authorizes unconscionability to be determined "as a matter of law" (Civ. Code, § 1670.5), completes the nominal transmutation of the equitable doctrine into a rule of law. Legalization of the doctrine was designed by the drafters of the Uniform Commercial Code to "invite[] courts to police bargains overtly for unfairness instead of resorting to 'covert tools.' In the words of the comments to the [Uniform Commercial Code]: [¶] '[Section 2-302] is intended to make it possible for the courts to police explicitly against the contracts or clauses which they find to be unconscionable. In the past such policing has been accomplished by adverse construction of language, by manipulation of the rules of offer and acceptance or by determinations that the clause is contrary to public policy or to the dominant purpose of the contract.' " (1 Farnsworth on Contracts (1990) § 4.28, 496, fn. omitted.)

The legislative history of Civil Code section 1670.5, briefly described in *IMO Development Corp.* v. *Dow Corning Corp.* (1982) 135 Cal.App.3d 451, 459-460 [185 Cal.Rptr. 341], indicates our Legislature had the same purpose in mind.

[4]"(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(b) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

[5]Our opinion in *California Grocers Assn.* v. *Bank of America* (1994) 22 Cal.App.4th 205 [27 Cal.Rptr.2d 396] should not be otherwise construed.

"The procedural element focuses on two factors: 'oppression' and 'surprise.' [Citations.] 'Oppression' arises from an inequality of bargaining power which results in no real negotiation and 'an absence of meaningful choice.' [Citations.] 'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms. [Citations.]" (*A & M Produce Co.* v. *FMC Corp.*, *supra*, 135 Cal.App.3d 473, 486.)[6]

Substantive unconscionability is less easily explained. "Cases have talked in terms of 'overly harsh' or 'one-sided' results. [Citations.] One commentator has pointed out, however, that '. . . unconscionability turns not only on a "one-sided" result, but also on an absence of "justification" for it.' [citation], which is only to say that substantive unconscionability must be evaluated as of the time the contract was made. [Citation.] The most detailed and specific commentaries observe that a contract is largely an allocation of risks between the parties, and therefore that a contractual term is substantively suspect if it reallocates the risks of the bargain in an objectively unreasonable or unexpected manner. [Citations.] But not all unreasonable risk allocations are unconscionable; rather enforceability of the clause is tied to the procedural aspects of unconscionability . . . such that the greater the unfair surprise or inequality of bargaining power, the less unreasonable the risk reallocation which will be tolerated. [Citation.]" (*A & M Produce Co.* v. *FMC Corp.*, *supra*, 135 Cal.App.3d at p. 487.) In *California Grocers Assn.* v. *Bank of America*, *supra*, 22 Cal.App.4th 205, this court rejected the "reasonableness" standard applied in *A & M Produce Co.* v. *FMC Corp.*, *supra*, 135 Cal.App.3d at pp. 486-487, as being inherently subjective. (*California Grocers Assn.* v. *Bank of America*, *supra*, 22 Cal.App.4th at p. 214.) We instead reverted to the traditional standard of unconscionability—contract terms so one-sided as to "shock the conscience." (*Ibid.*; accord, *American Software Inc.* v. *Ali* (1996) 46 Cal.App.4th 1386 [54 Cal.Rptr.2d 477].)

One commentator sums up the matter as follows: " '[p]rocedural unconscionability' has to do with matters relating to freedom of assent. 'Substantive unconscionability' involves the imposition of harsh or oppressive terms on one who has assented freely to them." (Hawkland, Uniform Commercial

---

[6]Among other authorities Justice Wiener cites in *A & M Produce* as having usefully elaborated on the meaning and application of the concept of unconscionability are Ellinghaus, *In Defense of Unconscionability* (1969) 78 Yale L.J. 757; Eddy, *On the "Essential" Purposes of Limited Remedies: The Metaphysics of UCC Section 2-719(2)* (1977) 65 Cal.L.Rev. 28; Spanogle, *Analysing Unconscionability Problems* (1969) 117 U. Pa. L.Rev. 931; see also Leff, *Unconscionability and the Code—The Emperor's New Clause* (1967) 115 U. Pa. L.Rev. 485; Epstein, *Unconscionability: A Critical Reappraisal* (1975) 18 J.L. & Econ. 293; and Hillman, *Debunking Some Myths About Unconscion-ability: A New Framework for U.C.C. Section 2-302* (1981) 67 Cornell L.Rev. 1.

Code Series (1996) § 2-302:02 (Art. 2), p. 246.) The prevailing view is that these two elements must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability. (*Id.*, § 2-302:03 (Art. 2), p. 249, and cases cited at fn. 4; *id.*, § 2-302:05 (Art. 2), p. 266.) This is consistent with the concept of unconscionability articulated in *Scissor-Tail.* (*Perdue* v. *Crocker National Bank, supra,* 38 Cal.3d at p. 925, fn. 5; *A & M Produce, Inc.* v. *FMC Corp., supra,* 135 Cal.App.3d at p. 487.)

■ In the present case, the threshold question is whether the subject arbitration clause is part of a contract of adhesion, thereby establishing the necessary element of procedural unconscionability.

## A.

The standard definition of a "contract of adhesion" is " 'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " (*Scissor-Tail, supra,* 28 Cal.3d at p. 817, quoting *Neal* v. *State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781], opn. by Tobriner, J.)

Supercuts maintains that the contract here is not adhesive because it did not have superior bargaining strength. It emphasizes that Stirlen was not a person desperately seeking employment but a successful and sophisticated corporate executive Supercuts sought out and "hired away" from a highly paid position with a major corporation "by offering him an annual salary of $150,000, and then agreeing to remunerative 'extras' not included in the standard executive employment agreement," such as generous stock options, a bonus plan, a supplemental retirement plan, and a $10,000 "signing bonus." We are unpersuaded.

For one thing, Stirlen does not even arguably possess the bargaining strength of the plaintiff in *Scissor-Tail,* Bill Graham, who was the dominant rock music impresario of his generation. Noting that virtually all concert artists with whom Graham wished to do business belonged to the labor union that prepared the contract at issue, and that such artists were not permitted to sign any form of contract other than the one prepared by the union, the court concluded that ". . . Graham, whatever his asserted prominence in the industry, was required by the realities of his business as a concert promoter to sign [union] form contracts," so that in effect "he was presented with the nonnegotiable option of accepting such contracts [as proposed] or not at all." (*Scissor-Tail, supra,* 28 Cal.3d at pp. 818-819.)

In the present case Stirlen appears to have had no realistic ability to modify the terms of the employment contract. Undisputed evidence shows that the terms of the contract, which were cast in generic and gender-neutral language, were presented to him after he accepted employment and were described as standard provisions that were not negotiable. The only negotiating between the parties regarding the conditions of Stirlen's employment related to the stock options, bonus and retirement plans, and other "extras," but these matters were the subject of a separate letter agreement Stirlen executed on January 25, 1993, more than a month before he signed the employment contract. Moreover, the letter agreement adverted to the "standard employment contract" Stirlen would be required to sign, noting that the terms of the letter agreement did not supplant but were "[i]n addition to the standard provisions of the contract . . . ." Stirlen's assertions that the employment contract was presented to him on a "take it or leave it basis" and that every other corporate officer was required to and had signed an identical agreement, were not disputed. We agree with the trial court's determination that the agreement to arbitrate was part of a contract of adhesion.

■ Having determined that the procedural element of unconscionability is present in this case, we turn to the matter of substantive unconscionability.

## B.

Implicitly conceding that the manifest one-sidedness of the arbitration clause appears objectively unreasonable on its face, Supercuts argues (1) that Stirlen is "estopped" from claiming it is unconscionable; (2) that the restriction on remedies, which Supercuts apparently considers the only substantively unconscionable aspect of the arbitration clause, was "revoked or waived" and therefore does not apply in this case; and (3) that, properly understood, the remaining provisions of the arbitration clause are not unconscionable. We reject all of these contentions.

## 1.

Supercuts claims Stirlen is "estopped" from claiming the arbitration clause is unconscionable because he "was too bright and too well experienced in the machinations of corporate management to sign an agreement that was 'unduly oppressive.' " This argument relates not so much to whether the contract is unduly oppressive as to whether it is adhesive, a matter we need not revisit. The suggestion that a contract or clause cannot be unconscionable if it is accepted by a knowledgeable party has been repudiated by our Supreme Court. As explained in *Scissor-Tail*, an adhesion contract or provision thereof will be denied enforcement if it is unduly oppressive *"even if*

consistent with the reasonable expectations of the parties." (*Scissor-Tail,* *supra,* 28 Cal.3d at p. 820, italics added, citing, as examples, *Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 878-879 [27 Cal.Rptr. 172, 377 P.2d 284] and *Jacklich* v. *Baer* (1943) 57 Cal.App.2d 684 [135 P.2d 179].) *Scissor-Tail* shows that our Supreme Court is among the many courts that "have begun to recognize that experienced but legally unsophisticated businessmen may be unfairly surprised by unconscionable contract terms. [Citations.]" (*A & M Produce Co.* v. *FMC Corp., supra,* 135 Cal.App.3d 473, 489-490.)

2.

 Supercuts does not contest the finding that the restriction on remedies is against public policy within the meaning of Civil Code section 1668 nor otherwise defend the restriction. It argues instead that the restriction does not apply in this case.

On July 21, 1994, after Supercuts learned Stirlen was considering a suit for wrongful termination, its general counsel, Lawrence D. Imber, sent Stirlen's counsel a letter reminding her of the arbitration clause. Imber stated that, in the event Stirlen intended to "assert a claim based on a statute, constitutional rights, etc. by which damages other than for contract breaches are permitted; . . . I will be willing to confer on the arbitrator authority to issue an award consistent with law, should the arbitrator, of course, find liability on the part of Supercuts in the first place." Supercuts maintains that "[b]y this offer [it] was essentially waiving or revoking paragraph 11(c) of the agreement."

Unimpressed with this contention, the trial court viewed the July 21 letter as merely a concession of the invalidity of the restriction on remedies and the one-sidedness of the entire arbitration clause. We agree the letter does not effectuate a revocation or waiver of the restriction on remedies. Among other things, Supercuts' "waiver or revocation" theory cannot be reconciled with the integration clauses of the employment contract. Paragraph 18 provides that the contract "may not be modified or amended by oral agreement, or course of conduct, but only by an agreement in writing signed by the parties." Paragraph 20 similarly provides that the terms of the contract embody "the complete agreement and understanding between the parties" and states the agreement of the parties "that no representations, inducements, promises or agreements, orally or otherwise, have been made by a party or anyone acting on behalf of a party that are not embodied herein, and that no other agreement or promise, whether oral or written, express or implied, shall be valid or binding." In light of these provisions, the July 21 letter can

be seen, at most, as an offer to modify the contract;[7] an offer that was never accepted. No existing rule of contract law permits a party to resuscitate a legally defective contract merely by offering to change it. Suffice it for present purposes to conclude that the restriction on remedies remains a part of the arbitration clause and is therefore relevant to the question whether that clause is unconscionable within the meaning of Civil Code section 1670.5.

### 3.

■ Finally coming to grips with the issue at the heart of this case, Supercuts alternatively claims the arbitration clause is not one-sided, and therefore unconscionable, because the apparent disparities are actually reasonable and fair. Its chief argument is that violation of the employer rights described in paragraphs 7, 8, 9, and 10 of the employment contract, pertaining to patent infringement, improper use of confidential information and competition, pose "an immediate threat to business operations" and therefore require immediate access to the courts, which alone can provide meaningful "emergency relief." According to Supercuts, "[s]imple business realities underscore a need for this type of immediate access to court-ordered relief which is simply not present in the context of the standard employment dispute."

We agree a contract can provide a "margin of safety" that provides the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need without being unconscionable. (See Hawkland, Uniform Commercial Code Series, *supra*, § 2-302:05 (Art. 2), p. 268.) However, unless the "business realities" that create the special need for such an advantage are explained in the contract itself, which is not the case here, it must be factually established. ■ Thus, subdivision (b) of Civil Code section 1670.5 provides that "[w]hen it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination." This language reflects "legislative recognition that a claim of unconscionability often cannot be determined merely by examining the face of the contract, but will require inquiry into its setting, purpose, and effect." (*Perdue* v. *Crocker National Bank, supra*, 38 Cal.3d 913, 926; see also *Rosenthal* v. *Great Western Financial Securities, Corp., supra*, 14 Cal.4th at pp. 412-415.)

■ Supercuts failed to provide the trial court evidence of the "business realities" it now relies upon because it was unwilling to concede during the

---

[7]The offer is also ambiguous, as the letter refers only to statutory or constitutional claims, and is therefore unclear whether the author of the letter contemplated that the arbitrator could award punitive damages if an appropriate basis were established on a tort cause of action.

proceedings below that it had any advantage under the arbitration clause that needed to be justified.[8] This evidentiary deficiency can be overlooked, however, because, the "business realities" belatedly claimed to justify the many advantages Supercuts enjoys under the arbitration clause would not provide such justification even if they had been factually established.

The forms of emergency judicial relief Supercuts asserts it must have *are* available to a party compelled to arbitrate a dispute. Code of Civil Procedure section 1281.8, subdivision (b), provides, as material, that "[a] party to an arbitration agreement may file in the court in the county in which an arbitration proceeding is pending, or if an arbitration proceeding has not commenced, in any proper court, an application for a provisional remedy in connection with an arbitrable controversy, but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without provisional relief." ■ As we noted in *Woolley* v. *Embassy Suites, Inc.* (1991) 227 Cal.App.3d 1520 [278 Cal.Rptr. 719], "[s]ection 1281.8 was enacted primarily to allow a party to an arbitration [or subject to an arbitration agreement] to obtain provisional judicial remedies without waiving the right to arbitrate, as some early cases had suggested. [Citations.] The statute covers not merely injunctions, but all provisional remedies, including attachments, temporary protective orders, writs of possession and appointments of receivers." (*Id.*, at p. 1527; *Jordan-Lyon Productions, Ltd.* v. *Cineplex Odeon Corp.* (1994) 29 Cal.App.4th 1459, 1471 [35 Cal.Rptr.2d 200].)[9] ■ The unilateral right to litigate rather than arbitrate claims therefore cannot be justified by the need for provisional remedies. Furthermore, justification would be lacking even if Supercuts could show that its legitimate dispute resolution needs could not always be met through arbitration, for that is also true with respect to employee claims.

While it may often be advantageous for employees to submit employment disputes to arbitration, it may also be disadvantageous. For example, arbitral discovery is ordinarily much more limited than judicial discovery, which may seriously compromise an employee's ability to prove discrimination or unfair treatment. (Bales, *Compulsory Arbitration of Employment Claims: A*

---

[8]In the trial court Supercuts rested its defense of the arbitration clause on the claims that the employment contract was not adhesive and the obligations under the arbitration clause were mutual "with respect to all claims raised in this case."

[9]It should also be noted that arbitrators are not themselves incapable of providing many forms of equitable relief, such as specific performance. As the Supreme Court has observed, "arbitrators do have the power to fashion equitable relief." (*Gilmer* v. *Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20, 32 [114 L.Ed.2d 26, 41, 111 S.Ct. 1647].) Arbitrators in California commonly provide such relief as specific performance, reformation and rescission. (*Advanced Micro Devices, Inc.* v. *Intel Corp.* (1994) 9 Cal.4th 362, 373 [36 Cal.Rptr.2d 581, 885 P.2d 994].)

*Practical Guide to Designing and Implementing Enforceable Agreements* (1995) 47 Baylor L.Rev. 591, 608-609 [It "would be impossible" for employees to prove disparate treatment "without the opportunity to obtain from [employers] statistical information about the employment practice in question."]; but see *Gilmer* v. *Interstate/Johnson Lane Corp.*, *supra*, 500 U.S. at p. 31 [114 L.Ed.2d at pp. 40-41].) Procedural protections available in arbitration are inferior in other ways to those employees may obtain in a judicial forum. As the Ninth Circuit noted in *Prudential Ins. Co. of America* v. *Lai* (9th Cir. 1994) 42 F.3d 1299, in California ". . . the privacy rights of victims of sexual harassment are protected by statutes limiting discovery and admissibility of plaintiff's sexual history in a judicial proceeding." (*Id.*, at p. 1305, fn. 4.) No such statutory protection is provided an employee compelled to arbitrate a claim of sexual harassment against an employer under an agreement of the sort presented here, in which the parties do not agree that the civil discovery statutes shall apply. (See Code Civ. Proc., §§ 1283.05, subd. (a), 1283.1.)[10]

Further, except in extraordinary circumstances, parties who submit a dispute to private arbitration also give up their right to review of an adverse decision. (*Moncharsh* v. *Heily & Blase* (1992) 3 Cal.4th 1, 32 [10 Cal.Rptr.2d 183, 832 P.2d 899]; *Advanced Micro Devices, Inc.* v. *Intel Corp.*, *supra*, 9 Cal.4th 362, 375; *Board of Education* v. *Round Valley Teachers Assn.* (1996) 13 Cal.4th 269 [52 Cal.Rptr.2d 115, 914 P.2d 193].) Thus, unlike Supercuts, which can obtain judicial review of an adverse judicial determination of its claims, its employees must accept adverse rulings on their employment claims *even if an error of fact or law appears on the face of the arbitrator's ruling and causes substantial injustice.* (*Moncharsh* v. *Heily & Blase*, *supra*, 3 Cal.4th at p. 28; see also Comment, *Contracting Employment Disputes Out of the Jury System: An Analysis of the Implementation of Binding Arbitration in the Non-Union Workplace and Proposals to Reduce the Harsh Effects of a Non-Appealable Award* (1995) 22 Pepperdine L.Rev. 1485; *Commonwealth Coatings Corp.* v. *Continental Casualty Co.* (1968) 393 U.S. 145, 148-149 [21 L.Ed.2d 301, 304-305, 89 S.Ct. 337] [observing that arbitration may require greater oversight than judicial proceedings].)

Supercuts relies on *Grubb & Ellis Co.* v. *Bello* (1993) 19 Cal.App.4th 231, 238 [23 Cal.Rptr.2d 281] for the proposition that "[m]utuality of obligation does not require that both parties to the agreement be subject to arbitration." That case involved real estate listing agreements providing for arbitration of any dispute between the parties. When the broker demanded arbitration on a fee dispute the defendant objected on the ground that the broker had not initialed each arbitration provision, as required by Code of Civil Procedure section 1298, subdivision (c), although the defendant had

---

[10]With respect to the California constitutional right to privacy, see *Vinson* v. *Superior Court* (1987) 43 Cal.3d 833, 841-843 [239 Cal.Rptr. 292] and *Mendez* v. *Superior Court* (1988) 206 Cal.App.3d 557, 569 [253 Cal.Rptr. 731].)

done so. The defendant argued that the court should "read into the statute the requirement of mutuality of remedy, namely arbitration, in order for such an arbitration provision to be valid." (19 Cal.App.4th at pp. 238-239.) Confining its analysis to the language of Code of Civil Procedure section 1298, subdivision (c), which pertains only to real estate contract arbitration, the court concluded ". . . there is no reason to find the statute requires mutuality of arbitration by necessary implication." (19 Cal.App.4th at p. 239.) "The section is designed to ensure that a party to a listing agreement is not subjected to arbitration without notice of the rights being waived and to assure his or her written assent to the arbitration provision. The written assent of the other party to the agreement is not 'necessary, essential, natural or proper' to accomplish these goals." (*Id.*, at p. 240.)

To the extent *Grubb & Ellis* suggests mutuality of arbitral obligation is not required,[11] we question the court's analysis of this issue, which has never been relied upon by other courts and is hard to reconcile with other pertinent cases requiring mutuality of the arbitral obligation. (See, e.g., *Hull* v. *Norcom, Inc.* (11th Cir. 1985) 750 F.2d 1547, 1550 ["the consideration exchanged for one party's promise to arbitrate must be the other party's promise to arbitrate at least some specified class of claims"]; see also *Saika* v. *Gold* (1996) 49 Cal.App.4th 1074 [56 Cal.Rptr.2d 922].) In any event, *Grubb & Ellis* is inapposite. First, the analysis of the case is based upon a statute that has no application here. Second, the arbitration provisions at issue in *Grubb & Ellis* were not claimed to be unconscionable and bear little resemblance to the arbitration clause at issue in this case. Thus, *Grubb & Ellis* would not be dispositive even if the court in that case had properly rejected the requirement of mutuality as an absolute prerequisite to the validity of an arbitration agreement. The issue here is not simply the unilateral nature of the compulsory duty to arbitrate, but a variety of attendant discrepancies all favorable to the employer and prejudicial to employees.

One of the most significant discrepancies, of course, is the unilateral restriction on employee remedies and the nature of the rights employees are deprived of in this manner. While Supercuts is deprived of no common law or statutory remedies that may be available to it under paragraphs 7, 8, 9 and 10 of the employment contract, remedies available to employees in employment disputes are severely curtailed. Not only are employees denied punitive damages for tort claims, they are also denied relief for statutory claims, specifically including those brought under the California Fair Employment

---

[11]While the court suggested in dicta that the broker's failure to initial the arbitration provisions "might" relieve it of the duty to arbitrate a dispute initiated by the defendant, because "[n]othing in established contract law proscribes a contract provision from subjecting only one party to arbitration" (19 Cal.App.4th at p. 239), that issue was never directly presented.

and Housing Act (Gov. Code, § 12940 et seq.; FEHA), title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.; Title VII), the Age Discrimination in Employment Act (29 U.S.C. § 621 et seq.; ADEA) and the Americans With Disabilities Act (42 U.S.C. § 12101 et seq.; ADA). For example, a cause of action for racial or sexual employment discrimination or harassment under the FEHA may sustain recovery of punitive damages. (*Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 220-221 [185 Cal.Rptr. 270, 649 P.2d 912]; *Roberts* v. *Ford Aerospace & Communications Corp.* (1990) 224 Cal.App.3d 793, 800-801 [274 Cal.Rptr. 139]; *Monge* v. *Superior Court* (1986) 176 Cal.App.3d 503 [222 Cal.Rptr. 64].) Similarly, under Title VII "[a] complaining party may recover punitive damages . . . if [he or she] demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved person." (42 U.S.C. § 1981a(a)(3).) The ADEA provides that an aggrieved person "may bring a civil action in any Federal district court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of the statute." (29 U.S.C. § 633a(c).) Appropriate injunctive relief is also available under the ADA including "order[s] to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities." (42 U.S.C. § 12188(a)(2).) Supercuts's arbitration clause not only deprives employees of the exemplary damages and equitable relief available under the foregoing federal statutes, but deprives them as well of the reasonable attorney fees, including litigation expenses, and costs, that prevailing parties can obtain under those statutes. (See, e.g., 42 U.S.C. § 12205.) The only remedy left to employees—actual damages for breach of contract—may bear no relation whatsoever to the extent of the wrong and the magnitude of the injuries suffered at the hands of the employer. This would amount to denial of the underlying cause of action, which would be preserved in name only.

Virtually conceding that such restrictions on remedies are against public policy, and claiming no commercial need for them whatsoever, Supercuts offers only the argument, which we have already rejected, that it "revoked or waived" the restriction in this case.

Apparently anticipating we might decide, as we have, that the restriction on remedies applies to Stirlen, Supercuts endeavors to justify the restriction on the theory that the employment disputes to which it applies can be initiated by an employer as well as an employee, and Supercuts has therefore subjected itself to the same limitations as apply to employees. This contention is exceedingly disingenuous. The mandatory arbitration requirement can only realistically be seen as applying primarily if not exclusively to claims arising out of the termination of employment, which are virtually certain to

be filed against, not by, Supercuts. Supercuts identifies no provision of the employment contract and no statute likely to give rise to a claim Supercuts would be compelled to submit to arbitration. The only "employment disputes" likely to be initiated by Supercuts—such as claims that an employee violated a non-competition agreement or divulged confidential information —need not be arbitrated.

*Saika* v. *Gold, supra,* 49 Cal.App.4th 1074, shows that provisions of arbitration agreements unduly advantageous to one party at the expense of the other will not be judicially enforced. That case involved an arbitration agreement between a doctor and a patient with a "trial de novo clause" providing that if the arbitrator's award was equal to or greater than $25,000, either party may request a trial de novo by filing a civil action in the superior court. Upon the filing of such an action, the arbitration award " 'will be null and void and may not be used for any purpose thereafter.' " (*Id.,* at p. 1077.) The Court of Appeal emphasized the one-sided nature of this provision, which it condemned as creating a " ' "heads I win, tails you lose" situation.' " (*Id.,* at p. 1079.) "As a practical matter, the benefit which the trial de novo clause confers on patients is nothing more than a chimera. The odds that an award will *both* (a) clear the $25,000 threshold but (b) *still* be so low that the *patient would want* to have a trial de novo are so small as to be negligible. Unless we are to assume that arbitrators in medical malpractice cases regularly and capriciously make awards substantially below what justice requires—and that is an assumption we will not indulge—the cases where the trial de novo clause could possibly benefit the patient are going to be rare indeed." (*Id.,* at p. 1080, italics in original.) Because the arbitration agreement provides "virtually no conclusiveness when the *patient* wins the arbitration," the court declared, ". . . the practical effect of the clause is to tilt the playing field in favor of the doctor." (*Id.,* at p. 1076, italics in original.) The court reversed the trial court's order denying the patient's petition to confirm the $325,000 arbitration award on equitable grounds: "Because it renders arbitration an illusory remedy for one party, the trial de novo clause here contravenes the strong public policy in favor of arbitration despite the fact that the patient signed the agreement and may be presumed to have known of the clause. Equity will not enforce this clause." (*Id.,* at p. 1082.)

Though it does not relate to the absence of finality as to any party, nor render arbitration a completely illusory remedy, the arbitration agreement before us lacks even the "modicum of bilaterality" present in *Saika*.[12] (49 Cal.App.4th at p. 1079.) Employer claims may be brought in court or

[12]In *Saika* the court invalidated only the trial de novo clause and enforced other unobjectionable provisions of the arbitration agreement. The one-sidedness in the arbitration clause

submitted to arbitration while claims for violation of employee rights must be arbitrated. Even with respect to employer claims that may be adjudicated, important rights that would otherwise be available to employees are severely restricted. Not only does the employee waive any meritorious objections that might be made to the jurisdiction of the federal or state court selected by the employer, but he or she waives as well any meritorious objections that might be made with respect to "the service of any such court." The most extreme burden imposed on employees is submission to the loss of his or her job, salary and all other benefits during the pendency of what may prove to be lengthy litigation, "without penalty to the Company" even in the event its claim proves unmeritorious. Supercuts offers no commercial justification whatsoever for this draconian provision, which appears calculated to intimidate any employee who might otherwise have the temerity to resist Supercuts' claims.

Having forfeited significant adjudicatory rights, employees are the beneficiaries of no compensating concessions in connection with the employment related claims against Supercuts which they must arbitrate. On the contrary, the concessions here again favor the employer. Employees agree to a one-year statute of limitation even as to claims to which a longer period would otherwise apply; and this period "shall not be subject to tolling, equitable or otherwise."[13] The failure of an employee to request arbitration within the prescribed period "shall constitute a *complete* waiver of *all* rights to raise *any* claims in *any* forum, arising out of *any* dispute described herein." Moreover, as earlier noted, the employee gives up remedies for willful fraud or other intentional acts of the employer as well as statutory remedies.

In short, the arbitration clause provides the employer more rights and greater remedies than would otherwise be available and concomitantly deprives employees of significant rights and remedies they would normally enjoy. Considering the terms of the arbitration clause in the light of the commercial context in which it operates and the legitimate needs of the parties at the time it was entered into, we have little difficulty concluding that its terms are " 'so extreme as to appear unconscionable according to the mores and business practices of the time and place.' . . . ." (*Williams* v. *Walker-Thomas Furniture Co.* (D.C. Cir. 1965) 350 F.2d 445, 450 [121 App.D.C. 315, 18 A.L.R.3d 1297].)

---

before us here does not arise out of a single provision of that clause but out of so many provisions that we are obliged to invalidate the entire clause. (See discussion, *post*, at p. 1552.)

[13]Thus, for example, an employee arbitrating a claim against Supercuts under the ADEA would not have the benefit of the tolling provision of that federal statute. (29 U.S.C. § 626(e)(2).)

## VI.

 Supercuts argues that the Federal Arbitration Act (9 U.S.C. §§ 1-16; FAA) precludes a finding the instant arbitration clause is unconscionable and unenforceable under California law.[14] We are unpersuaded.

Section 2 of the FAA states that a "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or submission . . . shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract*." (9 U.S.C. § 2, italics added.)

As it is undisputed Stirlen's employment related to interstate commerce, the sole federal question is whether the entire arbitration clause may be invalidated under the state doctrine of unconscionability without offense to the FAA. The answer requires a brief discourse on the purpose of that federal statute.

 In *Allied-Bruce Terminix Cos.* v. *Dobson* (1995) 513 U.S. 265 [130 L.Ed.2d 753, 115 S.Ct. 834], Justice Breyer explained that ". . . the basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate. [Citation.] The origins of those refusals apparently lie in ' "ancient times," ' when the English courts fought ' "for extension of jurisdiction—all of them being opposed to anything that would altogether deprive every one of them of jurisdiction.' " [Citations.] American courts initially followed English practice, perhaps just ' "stand[ing] . . . upon the antiquity of the rule" ' prohibiting arbitration clause enforcement, rather than ' "upon its excellence or reason." ' [Citation.] Regardless, when Congress passed the Arbitration Act in 1925, it was 'motivated, first and foremost, by a . . . desire' to change this antiarbitration rule. [Citation.] It intended courts to 'enforce [arbitration] agreements into which parties had entered,' . . . and to 'place such agreements "upon the same footing as other contracts." ' [Citation.]" (*Id.* at pp. 270-271 [130 L.Ed.2d at p. 762, 115 S.Ct. at p. 838].)

State laws held preempted by the FAA have been those which in some measure reflect the traditional antiarbitration bias. (See, e.g., *Doctor's Associates, Inc.* v. *Casarotto* (1996) 517 U.S. __ [134 L.Ed.2d 902, 116 S.Ct. 1652]; *Allied-Bruce Terminix Cos.* v. *Dobson, supra*, 513 U.S. 265.) By and large, the laws of this state do not fit this description.

Though application of particular California statutes has been found to conflict with the proarbitration policy of the FAA and to be preempted (see,

---

[14]This argument was not raised by appellants at trial or originally on this appeal. Because the matter raises pure questions of law as to which there are no disputed factual issues, we elected to solicit supplemental briefs and consider the question.

e.g., *Perry* v. *Thomas* (1987) 482 U.S. 483 [96 L.Ed.2d 426, 107 S.Ct. 2520] [Labor Code section 229, providing that wage collection actions may be maintained without regard to an agreement to arbitrate]; *Southland Corp.* v. *Keating* (1984) 465 U.S. 1 [79 L.Ed.2d 1, 104 S.Ct. 852] [provision of Franchise Investment Law precluding the arbitration of claims]), the public policy and laws of this state are generally as strongly supportive of arbitration as the FAA. (See, e.g., *Dryer* v. *Los Angeles Rams* (1985) 40 Cal.3d 406, 417 [220 Cal.Rptr. 807, 709 P.2d 826].) As the United States Supreme Court has acknowledged, California rules governing the conduct of arbitration (Code Civ. Proc., § 1280 et seq.) "are manifestly designed to encourage resort to the arbitral process" and do not conflict with "any . . . policy embodied in the FAA." (*Volt Info. Sciences* v. *Leland Stanford Jr. U.* (1988) 489 U.S. 468, 476 [103 L.Ed.2d 488, 498, 109 S.Ct. 1248].) Indeed, "the California arbitration rules . . . generally *foster* the federal policy favoring arbitration." (*Id.*, at p. 476, fn. 5 [103 L.Ed.2d at p. 498], italics added.) As our own Supreme Court has just pointed out, the fact that in most important respects the California statutory scheme on enforcement of private arbitration agreements is similar to the FAA is not surprising, "as the two share origins in the earlier statutes of New York and New Jersey. [Citations.]" (*Rosenthal* v. *Great Western Financial Securities Corp.*, *supra*, 14 Cal.4th at p. 406.)

Arbitration is not only legislatively endorsed but "judicially favored" in this state (*Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 707 [131 Cal.Rptr. 882, 552 P.2d 1178]), where it is seen "as an economical, efficient alternative to traditional litigation in law courts. [Citations.] And given its favored status, [California] courts 'indulge' every 'intendment' to implement and give effect to arbitration proceedings. [Citations.]" (*Saika* v. *Gold*, *supra*, 49 Cal.App.4th 1074, 1076.)

■■■■ The findings below that the restriction on arbitral remedies was unenforceable as against public policy, and that the arbitration clause was unenforceable in its entirety as unconscionable, are justified by sections of our Civil Code (§§ 1668 & 1670.5) that define "unlawful contracts."[15] These statutes do not single out agreements to arbitrate or in any way reflect an antiarbitration policy, nor do they facially conflict with substantive federal law in any particular area. The Supreme Court has made it clear that state courts can invalidate an arbitration clause on grounds such as these, which "arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." (*Perry* v. *Thomas*, *supra*, 482 U.S. 483, 492, fn. 9 [96 L.Ed.2d 426, 437]; accord, *Doctor's Associates, Inc.* v. *Casarotto*,

---

[15]Under Civil Code section 1667, an "unlawful contract" is one that is "1. Contrary to the policy of express law; [¶] 2. Contrary to the policy of express law, though not expressly prohibited; or [¶] 3. Otherwise contrary to good morals."

*supra*, 517 U.S. at p. __ [134 L.Ed.2d at pp. 907-908, 116 S.Ct. at p. 1655]; *Allied-Bruce Terminix Cos.* v. *Dobson, supra*, 513 U.S. 265, 281-282 [130 L.Ed.2d 753, 768-769, 115 S.Ct. 834, 843].) The only type of state laws to which the FAA does not defer are those "that take[] [their] meaning precisely from the fact that a contract to arbitrate is at issue . . . ." (*Doctor's Associates, Inc.* v. *Casarotto, supra*, 517 U.S. at p. __ [134 L.Ed.2d at p. 907, 116 S.Ct. at p. 1655].) As we have noted, this cannot be said of the principles codified in Civil Code sections 1668 and 1670.5.

It is an interesting question whether, as applied to an agreement to arbitrate, Civil Code section 1668's proscription of contracts designed "to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law" may be inconsistent with the underlying policy of the FAA,[16] on the theory that freedom of contract should encompass the right to waive statutory claims.[17] (See *Painters Dist. Council No. 33* v. *Moen* (1982) 128 Cal.App.3d 1032, 1037 [181 Cal.Rptr.

---

[16]Application of Civil Code section 1668 to bar prospective waivers of statutory and other rights cannot be deemed inconsistent with our own Arbitration Act, which, like section 2 of the FAA, provides that "[a] written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, *save upon such grounds as exist for the revocation of any contract.*" (Code Civ. Proc., § 1281, italics added.) Civil Code section 1668 clearly provides grounds under California law "for the revocation of any contract." (See, e.g., *Baker Pacific Corp.* v. *Suttles* (1990) 220 Cal.App.3d 1148 [269 Cal.Rptr. 709].)

[17]In *Gilmer* v. *Interstate/Johnson Lane Corp., supra*, 500 U.S. 20 the Supreme Court reiterated the principle, first stated in *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.* (1984) 473 U.S. 614, 628 [87 L.Ed.2d 444, 456, 105 S.Ct. 3346] that, " '[h]aving made the bargain to arbitrate [statutory claims], the party should be held to it *unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.*' " (*Gilmer, supra*, at p. 26 [114 L.Ed.2d at p. 37].) In *Prudential Ins. Co.* v. *Lai, supra*, 42 F.3d 1299, the Ninth Circuit pointed out that the holding in *Alexander* v. *Gardner-Denver Co.* (1974) 415 U.S. 36 [39 L.Ed.2d 147, 94 S.Ct. 1011] that an arbitration clause contained in a collective bargaining agreement could not supplant Title VII's enforcement scheme appears irreconcilable with (though it was not overtly overruled by) the holding in *Gilmer* "that individuals may contractually agree to arbitrate employment disputes and thereby waive the statutory rights to which they would otherwise be entitled." (*Prudential Ins. Co.* v. *Lai, supra*, 42 F.3d at p. 1303.) *Lai* goes on to make it clear that the Ninth Circuit believes employees may agree to arbitrate statutory claims. (Accord, *Baker* v. *Aubry* (1989) 216 Cal.App.3d 1259, 1265-1268 [265 Cal.Rptr. 381].)

The most recent indication of the United States Supreme Court's view on this issue was provided in *Mastrobuono* v. *Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52 [131 L.Ed.2d 76, 115 S.Ct. 1212]. That case involved an arbitration clause that did not specifically indicate whether punitive damages could be obtained but included a choice-of-law provision that stipulated the use of New York law, which prohibited arbitrators from awarding punitive damages. Nevertheless, emphasizing the strong policy of the FAA in favor of arbitration, the Supreme Court held that it was permissible for the arbitrator to award punitive damages because the agreement *implied* such damages would be available. (*Id.*, at pp. __-__ [131 L.Ed.2d at pp. 86-88, 115 S.Ct. at pp. 1218-1219].) The court indicated, however, that if punitive damages had been expressly precluded it would have enforced the parties' intent. (*Id.*, at p. __ [131 L.Ed.2d at pp. 83-84, 115 S.Ct. at p. 1216].) This dictum does not, however, pertain to statutory claims.

17] ["parties to an arbitration agreement are free to specify an arbitration procedure which differs from statutory requirements"].) Such a theory is highly problematical, however, for a variety of federal civil rights statutes, such as Title VII, vest employees with the right to punitive damages as well as other rights that have never been deemed prospectively waivable in the context of an employment dispute. Enforcement of a mandatory arbitration agreement that restricts such remedies, which for the most part were prescribed after enactment of the FAA in 1925, is not something Congress can be assumed to have contemplated. "Indeed," as some authorities have observed, "an agreement to waive punitive damages might be an unenforceable waiver of employees' 'Title VII right to seek statutorily authorized damages.'" (Note, *Developments in the Law: Mandatory Arbitration of Statutory Employment Disputes* (1996) 109 Harv. L.Rev. 1670, 1682, quoting Bales, *Compulsory Arbitration of Employment Claims: A Practical Guide to Designing and Implementing Enforceable Agreements, supra,* 47 Baylor L.Rev. at p. 614.)

In any case, as we have said, it is unnecessary for us to decide whether the FAA precludes the use of Civil Code section 1668 to invalidate an arbitration agreement as against public policy. Even if we were persuaded the FAA permits parties to an arbitration agreement to do that which section 1668 prohibits (and we are not) the restriction in this case would remain pertinent to the question of unconscionability, because it is so one-sided. The restriction on employee remedies (and concomitant enlargement of employer remedies) is simply one of the many bases of the finding below of unconscionability.

The FAA was clearly not designed to save an arbitration agreement as egregiously one-sided as the one before us, which would not survive scrutiny under legal or equitable principles applicable in almost every American jurisdiction. It must be kept in mind that the Uniform Commercial Code doctrine of unconscionability codified by Civil Code section 1670.5 is not unique to California but "has long been adopted by the majority of states." (*IMO Development Corp.* v. *Dow Corning Corp., supra,* 135 Cal.App.3d 451, 459.) Indeed, the doctrine had deep roots in Anglo-American jurisprudence long before it was made a part of the Uniform Commercial Code (See, e.g., *Hume* v. *United States* (1889) 132 U.S. 406, 411 [33 L.Ed. 393, 395-396, 10 S.Ct. 134], quoting *Earl of Chesterfield* v. *Janssen,* 2 Ves. Sen. 125, 155, 28 Eng. Rep. 82, 100 (1750 Ch.); Rest. 2d Contracts § 208, com. b, pp. 107-108.; 1 Farnsworth on Contracts, *supra,* § 4.27 at pp. 490-495.) State court application of the doctrine to invalidate arbitration agreements therefore would not "encourage and reward forum shopping," which would be of legitimate federal concern. (*Southland Corp.* v. *Keating, supra,* 465 U.S. 1, 15 [79 L.Ed.2d 1, 15].)

There is no shortage of pertinent cases holding that the FAA is not offended by the refusal to enforce an arbitration agreement under state

contract law principles similar to the doctrine of unconscionability. For example, in *Chan* v. *Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632 [223 Cal.Rptr. 838], a stockbroker brought a wrongful discharge action against her former employer, a securities brokerage firm. The firm moved to compel arbitration under the employment agreement, which assertedly incorporated a stock exchange rule requiring arbitration of employment disputes. The trial court denied the motion and the Court of Appeal affirmed. The appellate court held that although the FAA governs the interpretation of arbitration clauses, "[t]he *existence* of a valid agreement to arbitrate involves general contract law principles and state law governs disposition of that question." (*Id.*, at p. 640, italics in original; accord, *Cheng-Canindin* v. *Renaissance Hotel Associates* (1996) 50 Cal.App.4th 676 [57 Cal.Rptr.2d 867], and cases there cited.) The court found that the agreement did not clearly and unequivocally incorporate the stock exchange rule nor specifically refer to arbitration. Applying California law construing any ambiguity in a contract as to the formation of an agreement to arbitrate, the court held that the motion to compel arbitration was properly denied. The state law relied upon in *Chan* is no more generally applicable to contracts than the doctrine we rely upon here.

In *Chase* v. *Blue Cross of California* (1996) 42 Cal.App.4th 1142 [50 Cal.Rptr.2d 178], the insurer argued that state law calling for the forfeiture of the right to arbitration if the insurer breaches the covenant of good faith and fair dealing is preempted by the FAA. The Court of Appeal disagreed, pointing out that the covenant of good faith and fair dealing is implied "in every contract in California" and "can result in the revocation of any contract" (*id.*, at p. 1159), not just arbitration contracts. Thus, because it is "based upon a general contract principle," the court declared that denial of a motion to compel arbitration on that ground does not conflict with the FAA. If the FAA permits an arbitration agreement to be invalidated under our covenant of good faith and fair dealing, no reason appears why the federal statute should not permit such an agreement to be invalidated under our doctrine of unconscionability.

*Hull* v. *Norcom, Inc., supra,* 750 F.2d 1547, which was relied upon in *Chase, supra,* has particular relevance to the instant case, because it indicates that an arbitration clause in an employment contract similar in some respects to that before us may be found unenforceable as too one-sided under state contract law requiring mutuality of obligation. The arbitration clause of the contract at issue in *Hull* compelled both parties to submit disputes arising out of the agreement to binding arbitration. However, another provision of the contract rendered this mutual obligation illusory, because it granted the employer the unilateral right to a judicial forum if the employee breached confidentiality and noncompetition provisions in the employment contract,

or "for any breach of this Agreement." The Eleventh Circuit held the arbitration clause invalid and unenforceable under New York law that "an arbitration agreement will not be enforced unless it is 'mutually binding,' and an agreement is not mutually binding where one party reserves the option to raise any and all disputes that it may have against the other party in a court of law rather than through arbitration." (*Id.*, at p. 1549, citing *Miner* v. *Walden* (1979) 101 Misc.2d 814 [422 N.Y.S.2d 335].) The court concluded that application of such a general provision of state contract law to the determination of the making of an arbitration agreement "does not contravene the Federal Arbitration Act or its underlying policy." (750 F.2d at p. 1551.)

Cases holding that federal law bars application of the doctrine of unconscionability or other state contract laws to invalidate an arbitration agreement are all different from this case in one or more significant particulars.

*Dryer* v. *Los Angeles Rams, supra,* 40 Cal.3d 406 involved an employment contract with a standard provision calling for binding arbitration under the terms of the applicable collective bargaining agreement between the players' union and management of the National Football League. A clause permitting the league commissioner to remove from the grievance and arbitration process any dispute involving the "integrity" of or "public confidence in" professional football was found unconscionable by the trial court. The Supreme Court reversed on two grounds. First, the court explained that the collective bargaining agreement was subject to section 301(a) of the Labor Management Relations Act (LMRA) (29 U.S.C. § 185(a)), which "appears to limit a court's inquiry to a few basic questions concerning arbitrability of the dispute and defenses, if any, based on allegations of a lack of fair representation." (40 Cal.3d at p. 412.) The court found that the principles of unconscionability set forth in *Scissor-Tail, supra,* was incompatible with "national labor policy" when "applied in the context of a motion to compel arbitration under a provision of a collective bargaining agreement subject to section 301(a) [of the LMRA]." (*Ibid.*) There is no similar incompatibility in this case, as the trial court's finding of unconscionability offends neither the LMRA nor any other substantive federal law. The second basis of the reversal in *Dyer* was that, entirely aside from federal labor law, the provision of the agreement at issue was not unconscionable to begin with. The Supreme Court found that the trial court improperly "invalidated an entire arbitration procedure because of a purely speculative possibility that the commissioner might have the power, at some point, to withdraw the dispute from the normal arbitration process." (*Id.*, at p. 417.) The finding of unconscionability in the present case is not similarly speculative.

*Thomas* v. *Perry* (1988) 200 Cal.App.3d 510 [246 Cal.Rptr. 156] was decided on remand after reversal by the United States Supreme Court in

*Perry* v. *Thomas, supra,* 482 U.S. 483. The California court held that, pursuant to the high court's opinion, the FAA preempts Labor Code section 229, which provides that " '[a]ctions . . . for the collection of due and unpaid wages claimed by an individual may be maintained without regard to the existence of any private agreement to arbitrate.' " (200 Cal.App.3d at p. 512, fn. 2.) *Perry* is easily distinguishable. Unlike the doctrine of unconscionability, which applies to contracts generally, Labor Code section 229 not only applies specifically to arbitration agreements but reflects an antiarbitration policy. Because section 229 does not provide a legal or equitable ground "for the revocation of any contract," it is not among the grounds that may be used to invalidate an arbitration agreement under section 2 of the FAA.

The many state and federal cases pertaining to arbitration under rules of the New York Stock Exchange (NYSE) or the National Association of Securities Dealers (NASD) are distinguishable for a similar reason. *Cohen* v. *Wedbush, Noble, Cook, Inc.* (9th Cir. 1988) 841 F.2d 282, is typical of such cases. There the Ninth Circuit considered the enforceability of an agreement to arbitrate claims arising out of a stock margin purchase agreement. The plaintiffs objected to the trial court's order compelling arbitration on the ground, inter alia, "that the arbitration clause is unenforceable as an unconscionable provision of a contract of adhesion." (*Id.,* at p. 285.) This claim was based on two California cases arising out of challenges to the methods used by stockbrokers to calculate interest owed them by their clients. (*Lewis* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1986) 183 Cal.App.3d 1097 [228 Cal.Rptr. 345] and *Lewis* v. *Prudential-Bache Securities, Inc.* (1986) 179 Cal.App.3d 935 [225 Cal.Rptr. 69].) The California courts held in these cases that arbitration before the NYSE or NASD does not " 'meet[] the level of integrity requisite to withstand a challenge of unconscionability,' 179 Cal.App.3d at 944-45 . . . , because the challenged practices were virtually universal among securities brokerage firms, and thus any arbitration panel selected by the securities industry itself would be 'presumptive[ly] bias[ed].' *Id.* at 944." (*Cohen* v. *Wedbush, Noble, Cooke, Inc., supra,* at p. 285.) The Ninth Circuit disagreed "with the conclusion of the California courts that the doctrine of unconscionability is applicable *under these circumstances.*" (*Id.,* at p. 286, italics added.) The most pertinent "circumstance" was that "the Securities and Exchange Commission has virtually plenary authority over the arbitration procedures adopted by the national securities exchanges and securities associations. . . . Because Congress has committed to the SEC the task of ensuring that the federal rights established by the Securities Acts are not compromised by inadequate arbitration procedures, we are bound by the Commission's determination that the procedures at issue here are satisfactory. [Citation.] Any contrary holding would frustrate this carefully crafted federal regulatory scheme." (*Ibid.*) Thus the gravamen of *Cohen,* which relates more to the Securities Acts than the FAA, is that "agreements

to arbitrate disputes in accordance with SEC-approved procedures are not unconscionable as a matter of law." (*Ibid.*)

Because the unconscionability of arbitration agreements involving the securities industry has been so heavily litigated in federal courts and raises issues under the securities acts and other substantive federal laws, California courts are now unwilling to impose different criteria of unconscionability in such cases. (See, e.g., *Tonetti* v. *Shirley* (1985) 173 Cal.App.3d 1144, 1150-1151 [219 Cal.Rptr. 616]; *Lewis* v. *Prudential-Bache Securities, Inc., supra*, 179 Cal.App.3d 935, 941-943; cf. *Hope* v. *Superior Court* (1981) 122 Cal.App.3d 147 [175 Cal.Rptr. 851].) This has been particularly true with respect to the question of adhesiveness and the bias of the arbitrator or arbitral body. (See, e.g., *Downs* v. *Prudential-Bache Securities, Inc.* (1988) 202 Cal.App.3d 616, 621-622 [248 Cal.Rptr. 734].)

The present case is not analogous to those involving the securities industry. Neither the SEC nor any other federal body regulates the sort of arbitration procedure that is before us in this case or has approved a similar arrangement. On the contrary, the Commission on the Future of Worker-Management Relations, which was appointed by the United States Secretary of Labor to make recommendations regarding certain employment related issues, urges a variety of procedural protections for employees largely missing from Supercuts's standard employment contract,[18] and takes the position as well that mandatory agreements to arbitrate are ineffective and should not be imposed unilaterally by employers as a condition of employment. (Com. on Future of Worker-Management Relations, Rep. and Recommendations, *supra*, at pp. xix, 33; see also *McMillan* v. *Superior Court* (Cal.App.) ["Most of the serious problems of private judging are avoided when the process is invoked at the behest of all parties, or at least with their uncoerced consent."].)

---

[18]The report states that "both employers and employees agree that if private arbitration is to serve as a legitimate form of private enforcement of public employment law, these systems must provide:

"a neutral arbitrator who knows the laws in question and understands the concerns of the parties;

"a fair and simple method by which the employee can secure the necessary information to present his or her claim;

"a fair method of cost-sharing between the employer and employee to insure affordable access to the system for all employees;

"the right to independent representation if the employee wants it;

"a range of remedies equal to those available through litigation;

"a written opinion by the arbitrator explaining the rationale for the result; and "sufficient judicial review to ensure that the result is consistent with the governing laws." (Com. on Future of Worker-Management Relations, Rep. and Recommendations (Dec. 1994) at p. 31.)

Some California courts have been loathe to apply the doctrine of unconscionability articulated in *Scissor-Tail, supra,* 28 Cal.3d 807 to arbitration agreements subject to the FAA on the ground that the opinion in that case "weav[es] together principles of adhesion contracts and state statutes governing the neutrality of arbitrators," and the United States Supreme Court has taught "that a court may not rely upon anything that is unique to an agreement to arbitrate when assessing unconscionability of an agreement governed by the FAA." (*Heily* v. *Superior Court* (1988) 202 Cal.App.3d 255, 260 [248 Cal.Rptr. 673].) However, while the *form* of unconscionability involved in *Scissor-Tail* related to arbitration—the nonneutrality of the arbitrator—the fundamental principles set forth by the Supreme Court in that case relate to unconscionability in general, not simply to arbitration agreements. (See, e.g., *California Grocers Assn.* v. *Bank of America, supra,* 22 Cal.App.4th 205.) In any case, even if application of *Scissor-Tail* is preempted by the FAA on the theory that the opinion in that case "takes its meaning precisely from the fact that a contract to arbitrate is at issue" (*Thomas* v. *Perry, supra,* 200 Cal.App.3d at p. 514; see also *Allied-Bruce Terminix Cos.* v. *Dobson, supra,* 513 U.S. 265, 281-282), Civil Code section 1670.5 cannot be so narrowly construed.

The FAA does not reflect "a congressional intent to occupy the entire field of arbitration" but preempts state regulation in this area only "to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*Volt Info. Sciences* v. *Leland Stanford Jr. U., supra,* 489 U.S. 468, 477 [103 L.Ed.2d 488, 498], quoting *Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67 [85 L.Ed. 581, 586-587, 61 S.Ct. 399].) Judicial refusal to enforce an arbitration clause clearly unconscionable under a general contract law principle not at all hostile to arbitration presents no obstacle to the objective of the FAA or any other congressional purpose.[19] As stated in *Doctor's Associates, Inc.* v. *Casarotto, supra,* 517 U.S.

---

[19]To the extent the opinion of the Ninth Circuit in *Bayma* v. *Smith Barney, Harris Upham and Co., Inc.* (9th Cir. 1986) 784 F.2d 1023 may suggest otherwise we decline to follow it. *Bayma* was an action for breach of an employment contract against a brokerage firm. The district court denied the firm's request for a stay of judicial proceedings pending compulsory arbitration under a provision of the employment contract prescribed by the NYSE for use by its member firms. The Ninth Circuit held that the district court erroneously deferred to a state judicial decision declaring an identical employment contract unconscionable. The court reasoned that section 2 of the FAA "does not permit state law to carve out exceptions from arbitration merely because the state may prefer to have its citizens present their controversies in the court system. If the contract is one 'involving commerce,' then the question of arbitrability is controlled by federal law and not by state law." (784 F.2d at p. 1025.) This superficial and poorly reasoned opinion not only erred in suggesting that California prefers adjudication to arbitration, but confused the "issue of arbitrability" with the fundamental question of the validity of the agreement. *Bayma,* which might have reached the same result

____ [134 L.Ed.2d 902, 116 S.Ct. 1652], "generally applicable contract defenses, such as fraud, duress *or unconscionability*, may be applied to invalidate arbitration agreements without contravening § 2 [of the FAA]." (*Id.*, at p. ____ [134 L.Ed.2d at p. 909, 116 S.Ct. at p. 1656], italics added.)

For the foregoing reasons, we conclude that the equitable doctrine of unconscionability set forth in Civil Code section 1670.5, which was properly applied in this case, provides "such grounds as exist at law or in equity for the revocation of any contract," within the meaning of section 2 of the FAA, and there is therefore no federal preemption.

The arbitration clause, which provides a comprehensive mechanism for resolving all disputes likely to arise between the parties, is unconscionably one-sided and unfair in numerous respects and therefore unenforceable in its entirety. (See *Graham Oil* v. *ARCO Products Co.* (9th Cir. 1994) 43 F.3d 1244, 1248-1249.) We do not mean to suggest, of course, that the employment contract is otherwise objectionable or unenforceable, as Stirlen makes no such claim. Where, as here, "a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." (Civ. Code, § 1599; see also § 1670.5, subd. (a).)

The judgment is affirmed. Respondent shall be awarded costs on appeal.

Haerle, J., and Lambden, J., concurred.

On February 10, 1997, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied April 16, 1997.

---

on the valid but very different reasoning of another panel of the Ninth Circuit in *Cohen* v. *Wedbush, Noble, Cooke, Inc.*, *supra*, 841 F.2d 282, simply cannot be reconciled with the many decisions of the United States Supreme Court construing the FAA now extant, or the language of the FAA itself, which explicitly contemplates revocation of an arbitration agreement made unenforceable by neutral principles applicable to contracts generally. (9 U.S.C. § 2.)