Filed 4/13/16  Velyvis v. Adventist Health CA Medical Group CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN H. VELYVIS,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>ADVENTIST HEALTH CALIFORNIA MEDICAL GROUP INC.,<br><br>      Defendant and Respondent. | A144273<br><br>(Napa County<br>Super. Ct. No. 2662045) |

Appellant John H. Velyvis, M.D. (Dr. Velyvis) signed a "Physician Employment Agreement" that provided any unresolved disputes be referred to a retired judge pursuant to the reference provision in Code of Civil Procedure section 638[1].  The trial court ordered Dr. Velyvis's one remaining dispute to such a judge.  The judge heard Dr. Velyvis's claim and rejected it.  The Napa County Superior Court confirmed that decision, and entered judgment.

Dr. Velyvis appeals, essentially contending that the matter should never have been referred, a contention based on two fundamental arguments: (1) the reference provision is unconscionable and (2) his employer waived its right to the reference.  We affirm.

## BACKGROUND
### The Parties and the Employment Agreement

Dr. Velyvis is an orthopedic surgeon.  Respondent Adventist Health California Medical Group (for consistency with the briefing, CMG) is a professional medical

---

[1] All undesignated statutory references are to the Code of Civil Procedure.

corporation that contracts with St. Helena Hospital to provide professional medical services to its patients.

In July 2010 Dr. Velyvis entered into a "Physician Employment Agreement" (PEA) with CMG, an agreement that, according to a declaration from CMG's attorney—a declaration not rebutted by Dr. Velyvis—went through six drafts. Under the PEA Dr. Velyvis agreed to provide medical services at the hospital's outpatient orthopedic clinic and its orthopedic clinical and research center, including the Coon Joint Replacement Institute. Dr. Velyvis would receive base income of $600,000 per year, incentive compensation for certain work performed, a bonus, a benefit package, and some five weeks of flexible time off (FTO) annually.

Section 7.8 of the PEA, entitled "Dispute Resolution," provided in its entirety as follows:

"<u>Dispute Resolution.</u> In the event of any controversy or dispute related to or arising out of this Agreement, the Parties agree to meet and confer in good faith to attempt to resolve the controversy or dispute without an adversary proceeding. If the controversy or dispute is not resolved to the mutual satisfaction of the Parties within five (5) business days of notice of the controversy or dispute, the Parties agree to waive their rights, if any, to a jury trial and pre-trial discovery, and to submit the controversy or dispute to a retired judge or justice pursuant to Section 638(1) of the California Code of Civil Procedure, or any successor provision, for resolution in accordance with Chapter 6 (References and Trials by Referees), of Title 8 of Part 2 of the California Code of Civil Procedure, or any successor chapter. The Parties agree that the only proper venue for the submission of claims is the County of Napa, California, and that the hearing before the referee shall be concluded within nine (9) months of the filing and service of the complaint. The Parties reserve the right to contest the referee's decision and to appeal from any award or order of any court."

**Dr. Velyvis is Terminated, and Files Suit**

On January 25, 2012, CMG sent a letter to Dr. Velyvis advising that his employment was terminated for cause effective immediately.[2]  The stated reason for the termination was "The Group is taking this action as you are not currently, and have not for some time, been able to fill your obligations to provide the services contemplated by the Agreement.  Moreover, you are in breach of the Agreement in light of your failure to effectively maintain privileges to perform the types of procedures for which you were hired."

On January 31, six days after the termination letter, Dr. Velyvis filed suit against CMG, alleging five claims, styled as follows:  (1) Breach of Contract; (2) Breach of the Covenant of Good Faith and Fair Dealing; (3) Wrongful Discharge in Violation of Public Policy; (4) Breach of Labor Code Section 970; and (5) Unlawful Business Practices (Bus. & Prof. Code §17200 et seq.) (the wrongful discharge case).

What, if anything, that occurred in the wrongful discharge case is not in the record before us, though there is a reference in a declaration below that CMG filed an answer on February 29, and a reference in a brief that Dr. Velyvis sought a preliminary injunction compelling his reinstatement that was denied.

What we do know is that by March 6, some five weeks after the wrongful discharge case was filed, it was settled, as by that date the parties had entered into a "Settlement Agreement and Mutual Release."  The essence of the settlement was that Dr. Velyvis would receive $380,000, in exchange for which all claims would be released and the wrongful discharge case dismissed.

Despite agreeing to the settlement, later on March 6, Dr. Velyvis's attorney advised CMG's attorney that Dr. Velyvis believed CMG had not paid him for accrued but unused FTO.  CMG's attorney responded that according to CMG's records, it appeared CMG had compensated Dr. Velyvis for all FTO.  Dr. Velyvis's attorney persisted, so CMG reluctantly agreed to "carve out" from the settlement the FTO issue.  However,

---

[2] Despite this, CMG agreed to pay Dr. Velyvis through January 31.

CMG's counsel said he "made it clear to [Dr. Velyvis's attorney] during our phone conversation that, in light of the substantial six-figure settlement amount and CMG's demand for an all-encompassing release from Dr. Velyvis, the carve out covered only the value of any accrued but unused FTO; it did not include additional damages, such as waiting time penalties, which were explicitly included in the release."

In short, the parties agreed to "carve out" from the settlement the FTO issue, the releasing language in the final settlement agreement ending with this: "Notwithstanding the foregoing, PLAINTIFF does not release any claim he may have for accrued but unpaid PTO."[3]

The next day, March 7, CMG's attorney sent to Dr. Velyvis's attorney what he represented were all records of Dr. Velyvis's accrual of FTO, all of which had been signed by Dr. Velyvis (and most by his practice manager, Freda Barney). The accompanying e-mail stated as follows: "It appears Dr. Velyvis is misinformed regarding his PTO accrual/use. The attached documents show he used all his accrued PTO (and then some) prior to the termination of his employment. [¶] I trust this resolves the issue. If not, please feel free to give me a call." Indeed, according to CMG, the records showed Dr. Velyvis's FTO accrual and usage during each month of his employment and that as of his termination he had used more FTO than he had accrued.

Dr. Velyvis was not persuaded, and he filed the within action.

---

[3] Apparently the "carve out" of the FTO was not the only last-minute edit to the settlement agreement. According to the attorney for CMG, after drafting the settlement agreement, he "learned for the first time that Dr. Velyvis had filed a Chapter 7 bankruptcy proceeding, which he declined to disclose during the settlement negotiations." And counsel went on, "Dr. Velyvis initiated the Chapter 7 action in an effort to avoid paying a $350,000 attorneys' fees award against him in favor of another of his former employers, Desert Orthopedic Center (which he also unsuccessfully sued for wrongful termination). Accordingly, Dr. Velyvis' claims against CMG were the property of the bankruptcy estate and the settlement agreement had to be quickly amended to allow for review and approval by the Bankruptcy Court."

## Dr. Velyvis Files Another Lawsuit

On July 17, 2013, represented by the same counsel as in the wrongful discharge case, Dr. Velyvis filed the within action, alleging entitlement to accrued but unused FTO time. Despite that the carve out apparently dealt with a few days of FTO, the complaint alleged six causes of action: (1) Breach of Contract; (2) Breach of the Covenant of Good Faith and Fair Dealing; (3) Breach of Labor Code Sections 201, 203, 227.3; (4) Unlawful Business Practices (Bus. & Prof. Code §17200 et seq.); (5) Interference with Prospective Economic Advantage; and (6) Inducing Breach of Contract. Not only that, the FTO complaint named two law firms and two attorneys—attorneys, we note, who had represented parties adverse to Dr. Velyvis. Those attorney defendants were the firm of Long & Levit, along with Douglas Melton of that firm, who were CMG's attorneys in the wrongful discharge case; and John MacConaghy and the firm of MacConaghy & Barnier, who were counsel for the trustee in Dr. Velyvis's Chapter 7 bankruptcy filing.[4]

On August 1, Dr. Velyvis propounded form employment law interrogatories and document requests.

On August 27, the attorney defendants filed anti-SLAPP motions to dismiss. Following full briefing, the trial court, the Honorable Elia Ortiz, granted the anti-SLAPP motions, and the attorney defendants were dismissed from the case. Mr. MacConaghy and his firm moved for attorney fees, which Judge Ortiz ordered in the amount of $19,417.20. Dr. Velyvis appealed from that order, and we affirmed it in an unpublished

---

[4] This is how Dr. Velyvis describes the complaint in his opening brief: "The wrongful discharge settlement agreement entitled Dr. Velyvis to seek compensation for the few days of FTO that CMG owed him on his termination pursuant to Labor Code section 201(a). [Citation.] Although the amount of FTO owed to Dr. Velyvis in this second matter filed on July 17, 2013 [citation] is not great, Dr. Velyvis is also entitled to punitive damages of an additional 30 days of compensation as waiting time penalties pursuant to Labor Code section 203 and attorneys' fees pursuant to Labor Code sections 218.5 and 1194. [Citation.] The waiting time penalties alone would be more than $50,000, given an annual base salary of $600,000 [Citation.]" (Fn. omitted.)

5

opinion filed October 28, 2014 (*John Velyvis v. John H. MacConaghy et al.* (Oct. 28, 2014, A141332)).[5]

---

[5] Our opinion expressed some dismay about the tone and substance, of Dr. Velyvis's brief. For example, we began our discussion section with this:

"We begin by observing Dr. Velyvis's opening brief is permeated with an astonishingly intemperate attack on Judge Ortiz. The two captions in his brief read as follows:

" 'I. BACKGROUND: NAPA COUNTY'S BRAND-NEW JUDGE AWARDED ATTORNEYS' FEES IN AN ANTI-SLAPP CASE DESPITE THE ABSENCE OF INFORMATION SHE NEEDED TO CONSIDER OR EXPERIENCE AS A CIVIL TRIAL JUDGE SO THAT SHE COULD MAKE HER OWN ASSESSMENTS.'

" 'II. LEGAL ARGUMENT: THE NEW JUDGE COMING FROM A CRIMINAL LAW BACKGROUND, WAS NOT AN "EXPERIENCED TRIAL JUDGE" WHO COULD FILL IN THE MANY GAPS LEFT BY MacCONAGHY'S REQUEST FOR ATTORNEYS' FEES.'

"Such conduct is not to be condoned. (See *Fink v. Shemtov* (2010) 180 Cal.App.4th 1160, 1176.)

"It is unclear whether Dr. Velyvis's attack is aiming at what he claims is Judge Ortiz's inexperience, or incompetence, or bias, but it does not matter. To begin with, Dr. Velyvis's attempt to disqualify Judge Ortiz could be reviewed only by petition for a writ of mandate filed within 10 days of Judge Stone's decision on December 11, 2013. (Code, Civ. Proc., § 170.3, subd. (d).) No such petition was filed, and the issue of Judge Ortiz's perceived lack of qualifications cannot be raised on this appeal. (*PBA, LLC v. KPOD, Inc*. (2003) 112 Cal.App.4th 965, 970-971.) Moreover, insofar as Dr. Velyvis means to inject Judge Ortiz's qualifications into her decision to grant defendants' motion to strike, that effort is doomed by reason of his statement that he is not attempting to challenge that ruling—not to mention the additional reason that such order was appealable (Code Civ. Proc., § 904.1, subd. (a)(13)), and Dr. Velyvis failed to perfect a timely appeal from it. (*Russell v. Foglio* (2008) 160 Cal.App.4th 653, 659-661; *Maughan v. Google, Inc*. (2006) 143 Cal.App.4th 1242. 1247.) Likewise, Dr. Velyvis's argument that Judge Ortiz simply 'rubberstamped' defendants' motion for fees and costs out of inexperience must be summarily rejected.

"Dr. Velyvis cannot secure reversal by faulting the form of Judge Ortiz's order. The order addressed a motion for attorney fees, which does not require judicial explanation or a statement of decision. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1294; *Gorman v. Tassajara Development Corp*. (2009) 178 Cal.App.4th 44, 67.) Dr. Velyvis's arguments that defendants have 'not established entitlement to the requested attorneys' fees,' and that 'an award of attorneys' fees and costs requires a judicial finding' of entitlement misperceives the nature of section 425.16. Under subdivision (c) of that statute, as construed by our Supreme Court, '*any* . . . defendant who brings a successful motion to strike *is entitled to mandatory* attorney fees.' (*Ketchum v. Moses* (2001)

Meanwhile, before the anti-SLAPP motion was heard, CMG responded to the discovery requests, responding that as to seven categories of documents, "[a]ll responsive non-privileged documents in Defendant's care, custody or control will be produced." In regard to the remaining unanswered interrogatories and non-production of documents, Dr. Velyvis's counsel sent meet and confer letters. And on October 3, CMG promised that "we are working on gathering responsive documents and will provide supplemental or amended discovery responses, where necessary, in due course."

Later, however, by letter on October 22, CMG wrote as follows: "Given the flurry of activity at the outset of this matter we had not yet had a chance to review the procedural posture of the case. Upon further review, pursuant to section 7.8 of the contract between Dr. Velyvis and CMG, the parties agreed to submit any disputes arising out of the contract to a retired judge or justice pursuant to California Code of Civil Procedure section 638. The parties further expressly waived their right to pre-trial discovery. . . . *In light of section 7.8 of the parties' contract, we will not be providing further discovery responses or documents in response to Dr. Velyvis' written discovery requests.*" (Italics added.)

With the attorney defendants having been dismissed from the case, the litigation was now between Dr. Velyvis and CMG only.

### CMG Files for Judicial Reference

On October 31, CMG filed a motion for protective order as to the discovery issues and, as pertinent here, "to enforce dispute resolution provision."[6] The motion was set for hearing on December 5, before Judge Ortiz.

Dr. Velyvis opposed the motion, and the motion came on for hearing on December 11.[7] On that date Judge Ortiz noted that Dr. Velyvis's counsel was not authorized to

---

24 Cal.4th 1122, 1131, italics added.) The judicial finding of entitlement was implicitly made by Judge Ortiz when she granted defendants' motion to strike."

[6] In late October, CMG requested Dr. Velyvis to stipulate to judicial reference. He refused.

practice law as he was not an active member of the State Bar, and she continued the hearing so that counsel could cure the defect.

Dr. Velyvis's counsel cured the problem and filed a further opposition to CMG's motion, called a "Motion for Reconsideration." The opposition argued that a judicial reference and an arbitration are one and the same; that CMG waived the right to enforce the judicial reference provision by not seeking to enforce it in the wrongful discharge case and waiting too long to enforce it in the present action; and that the dispute resolution provision was no longer in effect after termination of Dr. Velyvis's employment.

On January 16, 2014, Judge Ortiz granted CMG's motion and denied Dr. Velyvis's motion for reconsideration. Judge Ortiz found that section 7.8 of the PEA "clearly references C.C.P. §638" and the case law and statutes concerning arbitration did not apply. She further held that CMG had not waived the dispute resolution provision through delay, and that Dr. Velyvis had not established that he would suffer prejudice by the submission of his claims to a referee. Based on all that, Judge Ortiz referred the entire matter, including pending discovery disputes, to a referee of the parties' choosing.

CMG apparently proposed several referees, all of whom Dr. Velyvis rejected. Dr. Velyvis proposed retired Napa County Superior Court Judge Scott Snowden. CMG agreed, and Judge Snowden became the referee, chosen by the parties.

The PEA did not address the issue of the payment of Judge Snowden's fee, and the parties could not agree as to any such allocation. So, on March 14, CMG filed in the Superior Court a motion under section 645.1 for an equal allocation of fees. The parties filed extensive briefs on the issue, and it came on for hearing on April 18, before the Honorable Rodney Stone. On April 30, Judge Stone entered his order, concluding as follows:

"Defendant's Motion is GRANTED. As the Physician Employment Agreement does not state which party is responsible for the cost of the referee, the cost should be

---

[7] Perhaps the reason for the resetting was that CMG had filed a peremptory challenge to Judge Ortiz. The challenge was ruled untimely.

8

split evenly between the parties. Plaintiff provides no authority for the proposition that Defendant is responsible for the entire cost of the judicial referee. Plaintiff's references to case law and statutes concerning arbitration are not on point. Plaintiff does not claim to be indigent or unable to pay his one half share of the cost of the referee."

Judge Snowden had set the matter for hearing, prior to which, on June 17 and 18, the parties submitted prehearing briefs and appendices of evidence. Neither Dr. Velyvis's brief nor his appendix of evidence is in the record. CMG's brief and appendix are. That appendix was voluminous, over 240 pages. It included Dr. Velyvis's complaint, the PEA, the letter terminating his employment, his FTO records that had been provided in March 2012, relevant portions of CMG's employee policy manual, and other work records. CMG also submitted two declarations, those of Freda Barney, the manager of Dr. Velyvis's practice, and Daniel Madrid, CMG's Chief Executive Officer.

On June 25, Judge Snowden held a one-day hearing. Both sides were represented by counsel. The issues addressed were (1) whether as of his termination date Dr. Velyvis had accrued any unused FTO; and (2) whether Dr. Velyvis was entitled to the discovery he was seeking, which related to the FTO records of other doctors.

Judge Snowden heard from three witnesses: Dr. Velyvis, Mr. Madrid, and Ms. Barney. Judge Snowden admitted various exhibits, and he also conducted an in camera review of the FTO records for other doctors at the Coon Joint Replacement Institute.

Following the hearing, the parties submitted post-hearing briefs, which were followed by reply briefs.

On September 16, Judge Snowden issued a comprehensive 15-page statement of decision, a decision that can only be described as outright victory for CMG—and outright rejection of all of Dr. Velyvis's claims.

As to Dr. Velyvis's FTO claim, Judge Snowden ruled in favor of CMG in all respects. Discussing for over four pages the testimony of the witnesses and the documentary evidence, Judge Snowden found that Dr. Velyvis had used more FTO time than he had accrued. Then, Judge Snowden concluded as follows:

"There are a few problems with Dr. Velyvis's position. First, again, Dr. Velyvis failed to call Dr. Coon (or any other physician from the Coon Joint Replacement Institute, for that matter) to corroborate his account. Second, at the hearing, Mr. Madrid and Ms. Barney testified that physicians were required to use FTO for time spent attending or presenting at Continuing Medical Education events such as these. And third, Ms. Barney testified that when Dr. Velyvis was absent from work in order to attend marketing events that directly benefitted the Coon Joint Replacement Institute, she did not debit an FTO day for such absences, but she did deduct an FTO day when Dr. Velyvis was simply providing training and was being paid for it by a third party.

"Moreover, even if the Referee were to credit Dr. Velyvis's testimony that these four days directly benefitted the Joint Replacement Institute, and therefore, that these days should not be counted toward his FTO days, Dr. Velyvis's FTO balance would still be -3. Dr. Velyvis, therefore, would still not be entitled to any FTO pay.

"Because Dr. Velyvis's FTO balance was negative at the time of his termination, he is not entitled to any FTO pay. Dr. Velyvis is therefore also not entitled to the punitive damages, waiting time penalties, disgorgement of profits, attorneys' fees and interest that he seeks."

Turning to the second issue, described as "Is Dr. Velyvis entitled to further discovery?", Judge Snowden held he was not, concluding that the evidence sought was irrelevant. The issue was Dr. Velyvis's FTO, not that of other doctors, and Dr. Velyvis had the relevant documents—his own records, including FTO sheets and monthly FTO records signed by him. Moreover, Judge Snowden observed, Dr. Velyvis had failed to subpoena any of the other doctors, a failure Judge Snowden found "particularly glaring." But despite all that, as indicated, Judge Snowden took the further step of conducting an in camera review of other doctors' FTO records and found that the records did not assist Dr. Velyvis's case.

On October 16, Judge Stone entered an order confirming Judge Snowden's decision. Following that, judgment was entered, from which Dr. Velyvis filed a timely appeal.

10

# DISCUSSION

## Section 638 and the Law of Reference

Section 638 provides as follows:

"A referee may be appointed . . . upon the motion of a party to a written contract . . . that provides that any controversy arising therefrom shall be heard by a referee if the court finds a reference agreement exists between the parties:

"(a) To hear and determine any or all of the issues in an action or proceeding, whether of fact or of law, and to report a statement of decision."

Our colleagues in Division Five have well described the judicial reference procedure, in *O'Donoghue v. Superior Court* (2013) 219 Cal.App.4th 245, 255–256 (*O'Donoghue*):

" 'Judicial reference involves sending a pending trial court action to a referee for hearing, determination and a report back to the court.' (*Trend Homes, Inc. v. Superior Court* (2005) 131 Cal.App.4th 950, 955 (*Trend Homes*), disapproved on other grounds in *Tarrant Bell, supra,* 51 Cal.4th 538.) 'A general reference directs the referee to try all issues in the action. The hearing is conducted under the rules of evidence applicable to judicial proceedings. In a general reference, the referee prepares a statement of decision that stands as the decision of the court and is reviewable as if the court had rendered it. The primary effect of such a reference is to require trial by a referee and not by a court or jury. [Citation.]' (*Treo @ Kettner Homeowners Assn. v. Superior Court* (2008) 166 Cal.App.4th 1055, 1061 (*Treo*).)

"Section 638 'authoriz[es] courts to transfer a dispute to a referee' pursuant to a written agreement between the parties. (*Grafton Partners v. Superior Court* (2005) 36 Cal.4th 944, 960–961 (*Grafton*).)"

As indicated above, and as demonstrated by the discussion below, there are major differences between a section 638 reference and an arbitration, including that the rules of evidence apply, with perhaps the most significant difference being that a section 638 reference is subject to appeal under normal rules. In sum and in short, when the parties

11

agree to judicial reference as opposed to arbitration, they retain nearly all of their procedural and constitutional rights.

That a section 638 reference is different from an arbitration is manifest by the setting here: the PEA did not use the word arbitration; the parties never referred to arbitration, retention of an arbitrator, or any arbitration rules; and neither the trial court nor Judge Snowden ever described the judicial reference as an arbitration. There is no evidence that either party believed that they were agreeing to, or engaging in, arbitration.

Dr. Velyvis's brief ignores all that, and insists, however improperly, as referring throughout his briefing to the "arbitration", the "JAMS Arbitration", or the "638 Arbitration." And relying almost exclusively on arbitration cases, Dr. Velyvis makes an array of arguments, which we discuss below. But in Dr. Velyvis's words, his "lead argument is that CMG's form employment contract is unenforceable because it is pervaded by procedural and substantive unconscionability." We thus begin by addressing such argument—and find it wanting.

### Dr. Velyvis Has Not Demonstrated Unconscionability
### The General Law

Our Supreme Court recently discussed the law of unconscionability at length, in *Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 910–912 (*Sanchez*):

"To aid understanding of the issues in this case, we begin by discussing general principles of unconscionability. ' "One common formulation of unconscionability is that it refers to ' "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." ' [Citation.] As that formulation implicitly recognizes, the doctrine of unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." ' (*Sonic II, supra*, 57 Cal.4th at p. 1133.)

" ' "The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a

12

contract or clause under the doctrine of unconscionability." [Citation.] But they need not be present in the same degree. . . .'

"As we stated in *Sonic II*: 'The unconscionability doctrine ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as " ' "overly harsh" ' " (*Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 1532), " ' unduly oppressive' " (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 925, (*Perdue*)), " 'so one-sided as to "shock the conscience" ' " (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development* (2012) 55 Cal.4th 223, 246 (*Pinnacle*)), or "unfairly one-sided" (*Little* [*v. Auto Stiegler, Inc*. (2003)] 29 Cal.4th [1064], 1071). All of these formulations point to the central idea that unconscionability doctrine is concerned not with "a simple old-fashioned bad bargain" (*Schnuerle v. Insight Communications Co.* (Ky. 2012) 376 S.W.3d 561, 575 (*Schnuerle*)), but with terms that are "unreasonably favorable to the more powerful party." (8 Williston on Contracts (4th ed. 2010) § 18.10, p. 91). These include "terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms, or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction." (*Ibid*.)' (*Sonic II, supra*, 57 cal.4th at p. 1145.) Because unconscionability is a contract defense, the party asserting the defense bears the burden of proof. (*Id*. at p. 1148.)

". . . Rather, 'courts, including ours, have used various nonexclusive formulations to capture the notion that unconscionability requires a substantial degree of unfairness *beyond "a simple old-fashioned bad bargain."* ' (*Id*. at p. 1160, italics added.) This latter qualification is important. Commerce depends on the enforceability, in most instances, of a duly executed written contract. A party cannot avoid a contractual obligation merely by complaining that the deal, in retrospect, was unfair or a bad bargain. Not all one-sided contract provisions are unconscionable; hence the various intensifiers in

13

our formulations: '*overly* harsh,' '*unduly* oppressive,' '*unreasonably* favorable.' (See *Pinnacle, supra*, 55 Cal.4th at p. 246 ['A contract term is not substantively unconscionable when it merely gives one side a greater benefit. . . .'].) We clarify today that these formulations, used throughout our case law, all mean the same thing.

"An evaluation of unconscionability is highly dependent on context. (See *Williams v. Walker-Thomas Furniture Co.* (D.C. Cir. 1965) 350 F.2d 445, 450 ['The test is not simple, nor can it be mechanically applied.'].) The doctrine often requires inquiry into the 'commercial setting, purpose, and effect' of the contract or contract provision. (Civ. Code, § 1670.5, subd. (b); accord, *Sonic II, supra*, 57 Cal.4th at pp.1147–1148; *Walker-Thomas Furniture*, at p. 450 [unconscionability must 'be considered "in the light of the general commercial background and the commercial needs of the particular trade or case" '].) As we have recognized, ' "a contract can provide a 'margin of safety' that provides the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need without being unconscionable." ' (*Armendariz, supra*, 24 Cal.4th at p. 177; see *Walker-Thomas Furniture*, at p. 450 ['where no meaningful choice was exercised upon entering the contract,' the test is 'whether the terms are "so extreme as to appear unconscionable according to the mores and business practices of the time and place" '].) And, as noted, the substantive unfairness of the terms must be considered in light of any procedural unconscionability. The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement."[8]

So, and most fundamentally, Dr. Velyvis must show both procedural unconscionability and substantive unconscionability. He has shown neither.

### No Procedural Unconscionability

As to procedural unconscionability, Dr. Velyvis's entire argument below was all of twelve lines:

---

[8] The law of unconscionability applies to all contracts. (*Sanchez, supra*, 61 Cal.4th at p. 912 ["unconscionability standard is, or it must be, the same for arbitration and non-arbitration agreement."].

14

"Unconscionable arbitration agreements are unenforceable. Unconscionability must be both procedural and substantive. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114-121). Procedural unconscionability is the absence of a meaningful opportunity to negotiate or the 'agreement' is presented on a take-it-or-leave-it basis. (*Wherry v. Award, Inc.* (2011) 192 Cal.App.4th 1242, 1246-1248). In *Wherry*, procedural unconscionability was established because the plaintiff was required to sign the agreement and he was given only a short time to sign it; the form (a realtor association form) was a take-it-or-leave-it agreement; and the exhibits appeared to be preprinted, only the compensation had been negotiated. (*Wherry v. Award, supra*, 192 Cal.App.4th at 1247). Dr. Velyvis' agreement was similar, consisting almost entirely of standard, boilerplate terms. The only items that Dr. Velyvis had discussed were compensation, a medical directorship and not being on emergency room call. When the hospital's CEO asked Dr. Velyvis to sign the CMG agreement he signed it on the spot. (Dr. Velyvis' declaration in opposition to CMG's motion for protective order, ¶ 3)." (Ftn. omitted.)

The referenced declaration—the sum total of Dr. Velyvis's testimony describing the PEA and how it came to be—was seven lines:

"I began my employment with CMG in 2010. Attached to my declaration as Exhibit A and incorporated by this reference is a true and correct copy of my Physician Employment Agreement with CMG dated July 1, 2010. I discussed only three items about my employment with Terry Newmyer, CMG's chief executive officer: salary, medical directorship and not being on emergency room call. Later, Rick Bockman, the chief executive officer of St. Helena Hospital presented me with the agreement, he asked me to sign the agreement then and there - which I did. No one mentioned, or discussed, Section 7.8 of the agreement or any of the issues presented in that part of the agreement."

That is it. It is manifestly insufficient.

While a finding of adhesion is not a prerequisite for procedural unconscionability (*Harper v. Ultimo* (2003) 113 Cal.App.4th 1402, 1408–1410), most cases finding unconscionability have involved adhesion contracts. Certainly, Dr. Velyvis has not

15

shown such adhesion here, where even he admits he negotiated at least three specific terms in the PEA. This is consistent with CMG's attorney's description below, that "the employment contract was the product of extensive negotiations between Dr. Velyvis and CMG's counsel, including the exchange of at least six drafts of the agreement."[9]

Dr. Velyvis points to no evidence to support any claim that the judicial reference provision was not subject to negotiation, or that CMG would not have hired him had he refused to agree to the provision. (See *Circuit City Stores, Inc. v. Ahmed* (9th Cir. 2002) 283 F.3d 1198, 1199.) Simply, there is no evidence that Dr. Velyvis was required to sign the PEA with a judicial reference provision to obtain employment with CMG, no evidence his employment was conditioned on it. Moreover, the negotiations establish that the parties both had bargaining power. So too, do other facts, including that Dr. Velyvis, a well-educated orthopedic surgeon, was to be paid an annual base salary of $600,000 plus much more. He did not lack bargaining power.

Dr. Velyvis's assertion that he was "asked" to sign the PEA when it was given to him is hardly enough, even if he had been pressured to sign—which he does not assert. (See *Rosenthal v. Great Western Fin. Securities Corp*. (1996) 14 Cal.4th 394, 424 fn. 12 [even a claim that plaintiff "felt 'rushed' . . . or 'pressured,' " standing alone is insufficient. "Without evidence [that the other party] actually took some action or said something to hurry or pressure the [plaintiff], however, these claims add nothing . . . ."].)

In sum, Dr. Velyvis failed to demonstrate that the PEA was a contract of adhesion. But even if he had, "procedural unconscionability requires oppression or surprise. ' "Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form." ' [Citation.]" (*Pinnacle, supra,* 55 Cal.4th at p. 247). Dr. Velyvis's opening brief does not even attempt to show oppression or surprise, not even mentioning either subject. CMG's respondent's brief devotes over three pages to its argument that

---

[9] Dr. Velyvis contends on appeal that this evidence is inadmissible hearsay, a claim he did not meaningfully urge below.

Dr. Velyvis "made no attempt to establish oppression or surprise." Dr. Velyvis's reply brief ignores the issue.

Dr. Velyvis having failed to demonstrate procedural unconscionability, his claim necessarily fails, and we need not reach the subject of substantive unconscionability. But there, too, Dr. Velyvis's claim fails.

### No Substantive Unconscionability

Though his argument is disjointed, and inconsistent between the opening and reply briefs, we understand Dr. Velyvis to contend that the judicial reference provision is substantively unconscionable in four particulars: (1) the waiver of pretrial discovery; (2) the waiver of jury trial; (3) it allows CMG but not Dr. Velyvis to seek equitable relief; and (4) it would potentially require Dr. Velyvis to pay for all dispute resolution costs, including CMG's attorneys' fees. In a related argument, Dr. Velyvis also contends that the trial court unconscionably ordered Dr. Velyvis to pay half of Judge Snowden's costs.

Our colleagues described the issue of substantive unconscionability as involving "contract terms that are so one-sided as to 'shock the conscience,' or that impose harsh or oppressive terms." (*24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th. 1199, 1213.) Dr. Velyvis fails to demonstrate that here.

Passing over that almost all Dr. Velyvis's cases involve arbitration, the applicable cases demonstrate that Dr. Velyvis's claims are easily rejected.

As to the claimed lack of discovery, it is probably enough to note that, whatever the PEA said, Dr. Velyvis's claim to discovery was considered. Specifically, Judge Ortiz ordered that "the case shall be submitted to a judicial referee" and "the judicial referee will determine discovery matters." And in accordance with that directive, Judge Snowden addressed Dr. Velyvis's discovery requests, ultimately to deny them. But not because Dr. Velyvis was not entitled, but because the material sought was irrelevant.

17

To the extent that this argument relies on Code of Civil Procedure, section 1282.2,[10] that section, which is part of the California Arbitration Act, does not apply—this is not arbitration. In any event, Dr. Velyvis's argument ignores section 1282.2's plain language, which requires discovery unless the "agreement otherwise provides." The PEA provided otherwise.

As to Dr. Velyvis's claim based on the jury waiver, section 638 and the cases interpreting it uphold such waiver. As our Supreme Court described in a case relied on by Dr. Velyvis, section 638 "include[s] predispute agreements, now authorizing a judicial reference 'upon . . . the motion of a party to a written contract or lease that provides that any controversy arising therefrom shall be heard by a referee.' " (*Grafton, supra,* at pp. 960–961 (*Grafton*), quoting Code Civ. Proc. § 638 [emphasis omitted].)

So, for example, in *Woodside Homes of California, Inc. v. Superior Court* (2006) 142 Cal.App.4th 99, 104–105 (*Woodside),* the court noted that "A statute permitting agreement for a reference unambiguously results in a waiver of 'jury trial' without the need to use those words. Such a reference (like arbitration) entails dispensing with trial in the judicial forum, including jury trial." *O'Donoghue* is in accord, upholding a jury waiver where the subject was not even mentioned in the agreement, citing cases enforcing reference provisions "that did not mention the words 'jury,' 'waiver,' or 'trial.' " (*O'Donoghue, supra*, 219 Cal.App.4th at p. 256.)

Dr. Velyvis next contends that the PEA is substantively unconscionable because it grants CMG the right to equitable relief while denying Dr. Velyvis that right. Section 6.4 of the PEA—language Dr. Velyvis ignores—explains why his claim must fail. This

---

[10] This section provides as follows: "Unless the arbitration agreement otherwise provides . . . . [¶] . . . [¶] Either party shall within 15 days of receipt of the notice of hearing have the right to demand in writing, served personally or by registered or certified mail, that the other party provide a list of witnesses it intends to call designating which witnesses will be called as expert witnesses and a list of documents it intends to introduce at the hearing provided that the demanding party provides such lists at the time of its demand. A copy of such demand and the demanding party's lists shall be served on the arbitrator." (Code Civ. Proc., § 1282.2, introductory para. & subd. (a)(2)(A).)

18

Section provides: "Physician hereby acknowledges that the breach by Physician of any provision of this Article VI would result in irreparable harm to Group, the amount and nature of which cannot be reasonably or adequately compensated for in money damages. Physician therefor [*sic*] agrees that Group, in addition to any rights or remedies which Group may possess, shall be entitled to injunctive and other equitable relief to prevent or remedy a breach by Physician of this Article VI."

This section restates the common law principle that injunctive relief may be available where contract damages do not suffice to compensate plaintiff. (*Tamarind Lithography Workshop, Inc. v. Sanders* (1983) 143 Cal.App.3d 571, 575 [equitable remedy available where legal remedy "inadequate as a matter of law"].) This simply confirms CMG's right to seek equitable relief in certain circumstances . And it is specific to CMG because it deals with violations of Article VI of the PEA, which addresses Dr. Velyvis's obligation not to compete with CMG.

Finally, there is nothing necessarily one-sided about this provision, as there is nothing in the PEA that prevents Dr. Velyvis from pursuing an equitable remedy, as perhaps best shown by Dr. Velyvis's attempt to obtain a preliminary injunction compelling his reinstatement.

Dr. Velyvis's final claim of substantive unconscionability attacks the provision in the PEA allowing the prevailing party to recover fees and costs. That is in Section 7.3, which states that "[i]f either Party brings an action for any relief or collection against the other Party, declaratory or otherwise, arising out of the arrangement described in this Agreement, the losing Party shall pay to the prevailing Party a reasonable sum for attorneys' fees and costs actually incurred in bringing such action . . . ."

Section 7.3 applies to "an action for any relief." It thus applies independently of the judicial reference provision. So, Dr. Velyvis could have been responsible for attorney fees under this provision whether or not the case was sent to judicial reference. Beyond that, we see no difference between this provision and any attorney fee provision in any contract allowing attorney fees to the prevailing party.

19

In arguments related to unconscionability, Dr. Velyvis claims that (1) the reference provision is unconscionable because the trial court allocated the judicial reference costs equally between him and CMG; and (2) he was denied a civil action, in violation of Labor Code section 229.  Neither claim has merit.

Section 645.1, subd. (b) provides that when there has been a judicial reference, the court may order the payment of the referee's fees in any manner that is "fair and reasonable, including an apportionment of the fees among the parties."  This, of course, is reserved for the court's discretion.  And Dr. Velyvis has not demonstrated any abuse, not where the court apportioned the fees 50-50.  This is certainly reasonable, especially where Dr. Velyvis was earning more than $600,000 annually.[11]

As to the Labor Code section 229 claim, it cannot apply.  That section provides that "[a]ctions to enforce the provisions of this article for the collection of due and unpaid wages claimed by an individual may be maintained without regard to the existence of any private agreement to arbitrate."  Here, as noted, there was no agreement to arbitrate, but rather an agreement to a judicial reference.  (See *Woodside, supra*, 107 Cal.App.4th at p. 726 ["this is *not* an arbitration case, and therefore not all authorities dealing with arbitration agreements are directly relevant."].)  Beyond that, a judicial reference is a civil proceeding, "a pending court action [that] is sent to a referee for hearing, determination and a report back to the court." (*Treo, supra*, 166 Cal.App.4th at p. 1061.)  The judgment that follows is a judgment of the court, following the referee's recommendation "on the merits of any disputed issue," objections by the parties, responses to the objections, and the court's review of the objections and the entry of "appropriate orders."  (Code Civ. Proc., §643, subd. (c).)  And the court need not adopt the referee's recommendations.

_____

[11] While we conclude that an equal allocation was fair under the circumstances, such allocation is irrelevant to the issue of unconscionability, which depends on the PEA's language and the parties' expectations when they signed it—not by an after-the-fact allocation of costs by the court.  (Civ. Code. §1670.5, subd. (a) ["If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable *at the time it was made* the court may refuse to enforce the contract"] (emphasis added).)  Given that the PEA is silent on cost allocation, Dr. Velyvis would have to establish that the *silence* is unconscionable.

20

**Dr. Velyvis Has Not Demonstrated Waiver**

Dr. Velyvis argued below, and maintains here, that CMG waived the right to judicial reference. Judge Ortiz rejected the claim, in a thorough discussion that found Dr. Velyvis's arguments "not persuasive," a discussion that ended as follows:

"Even when a party has used discovery procedures and has delayed in seeking judicial reference, if there is no prejudice to the other party, a court may conclude that there has been no waiver of the right to judicial reference. [Citation.] Plaintiff has not established that he will be prejudiced . . . ."

Never even acknowledging Judge Ortiz's findings, Dr. Velyvis argues that CMG waived its rights in two particulars: (1) because "CMG did not raise the 'referee' issue" in the wrongful discharge case, and (2) by delay, going on to assert that "CMG repeatedly waived its numerous opportunities to seek arbitration."

The argument is particularly unpersuasive, especially in light of the appellate law, which is devastating. Again *O'Donoghue* is apt:

" ' "Generally, the determination of waiver is a question of fact, and the trial court's finding, if supported by sufficient evidence, is binding on the appellate court. [Citations.]" ' . . . Where, as here, the facts are disputed, '[o]ur function is to determine whether the trial court's finding of no waiver is supported by substantial evidence.' [Citations.] 'We infer all necessary findings supported by substantial evidence [citations] and "construe any reasonable inference in the manner most favorable to the judgment, resolving all ambiguities to support an affirmance" [citation].' [Citation.] [¶] . . . Our high court, however, has articulated six factors a trial court should consider to determine whether a party has waived its right to arbitrate: ' " '(1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether "the litigation machinery has been substantially invoked" and the parties "were well into preparation of a lawsuit" before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) "whether important intervening steps

21

[e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place"; and (6) whether the delay "affected, misled, or prejudiced" the opposing party.' [Citations.]" ' (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196 (*St. Agnes*).)

"Though some courts apply a more limited three-factor test, ' "the party who seeks to establish waiver must show that some prejudice has resulted from the other party's delay in seeking arbitration." ' [Citations.] In addition, just as public policy favors arbitration, public policy should favor judicial reference. In a statutory judicial reference, parties have the advantage of a decision maker of the parties' own choosing, who will schedule reliable hearing and trial dates with flexibility to accommodate competing scheduling issues. (See Kough, *Judicial References* (Aug. 2013) Cal. Lawyer, p. 17; see also *Woodside I, supra*, 107 Cal.App.4th at pp. 732–733 [judicial reference 'provides economies both of time and expense'].) The parties retain the procedural rights of a civil trial court, including the right to appeal. (§645.) Parties may agree to a determination of all or only some of the issues in an action, 'whether of fact or of law' (§638, subd. (a)), and a referee may be appointed to 'ascertain a fact necessary to enable the court to determine an action or proceeding' (§638, subd. (b)). It follows that a party's argument that judicial reference has been waived should be subject to the same 'close judicial scrutiny' as a waiver of arbitration and the 'party seeking to establish a waiver bears a heavy burden of proof.' (*St. Agnes, supra*, 31 Cal.4th at p. 1195.) Applying these principles here, we conclude plaintiff has not waived its right to judicial reference because defendants have not demonstrated prejudice on the record before us." (*O'Donoghue, supra*, 219 Cal.App.4th at pp. 262–264.)

To sum it up: public policy favors judicial reference; the procedural rights of a civil case, including right to appeal, are maintained; Dr. Velyvis must show prejudice, and he has a "heavy burden of proof."

It is probably enough to note that Dr. Velyvis does not even attempt to meet his burden, not even arguing that there is no substantial evidence to support Judge Ortiz's ruling. In any event, Dr. Velyvis's attempt is inadequate.

Impliedly conceding that the last three of the six *St. Agnes* factors do not pertain, Dr. Velyvis attempts to rely on the first three: actions inconsistent with compelling reference, substantial invocation of litigation machinery, and prejudice. The reliance is misplaced.

Dr. Velyvis argues that waiver is demonstrated by the fact that CMG did not move for judicial reference in the wrongful discharge case. Dr. Velyvis cites no cases, and we have found none, holding that failure to move in one case shows waiver in another. In any event, the relevant factors focus on CMG's conduct, and prejudice to Dr. Velyvis in the pending litigation. So, not seeking a judicial reference in other litigation involving other issues is irrelevant, not to mention that the wrongful discharge case settled some five weeks after Dr. Velyvis filed it.

Dr. Velyvis argues that CMG waived its right to compel reference by promising in written discovery responses to produce documents. CMG, however, moved to compel judicial reference as soon as reasonably practicable, that is, shortly after the attorney defendants were dismissed on the anti-SLAPP motion.[12] In sum, Dr. Velyvis does not show that CMG invoked "the litigation machinery." What it did was respond to some discovery requests, which is certainly not enough, as *O'Donoghue* notes, holding that even *conducting* discovery does not constitute a waiver. (*O'Donoghue*, *supra*, 219 Cal.App.4th at p. 263–264.)

Finally, Dr. Velyvis has not met his heavy burden of showing prejudice. He contends he was prejudiced because CMG promised certain discovery but did not have to provide it because of the discovery waiver in the PEA; and he goes on, citing *O'Donoghue,* the discovery waiver was prejudicial because one of the factors establishing prejudice is whether "defendants have the same right to discovery before a

---

[12] Since the attorney defendants Dr. Velyvis named in the FTO case were not parties to the PEA, they had no contractual right to seek judicial reference. So, had CMG moved to compel judicial reference with the attorneys still in the case, CMG might well have faced the risk its motion would be denied, since a court that considers such a motion must consider "the risk of inconsistent rulings and consideration of judicial economy," with "inconsistent rulings" disfavored. (*Tarrant Bell, supra,* 51 Cal.4th. at pp. 544–545.)

23

judicial referee as they do in court." Not only does this misread *O'Donoghue*, but, as noted, the discovery issue was reserved by Judge Ortiz's order—and in fact decided by Judge Snowden.

Finally, Dr. Velyvis argues he was prejudiced because he had to pay his share of Judge Snowden's fees and might have had to pay attorney's fees incurred in the judicial reference proceeding  We addressed these issues above.  Furthermore, the argument is not related to waiver, i.e., it is not CMG's purported delay that caused, or could have caused, Dr. Velyvis to pay fees.

## DISPOSITION

The judgment is affirmed.  CMG shall recover its costs on appeal.

_____

Richman, Acting P.J.


We concur:


_____

Stewart, J.


_____

Miller, J.


A144273; *Velyvis v. Adventist Health*